THE CROWN COAL AND TOW COMPANY

*v.*

EDWARD L. THOMAS.

*Opinion filed December 21, 1898—Rehearing denied February 22, 1899.*

1. ACCOUNTING—*when equity may take jurisdiction in matters of account.* Equity may take jurisdiction in matters of account when the state of accounts between the parties is intricate and complicated, or so involved with the rights of third parties that it would be difficult for a jury to unravel the numerous transactions.

2. SAME—*jurisdiction of equity in accounting not dependent on absence of remedy at law.* The jurisdiction of equity in matters of account does not depend upon the absence of any remedy at law, but upon the adequacy and practicability of such remedy and upon the discretion of the court.

3. CORPORATIONS—*when party is entitled to be reimbursed for contributed capital though he has parted with stock.* One who assists in forming a corporation the capital of which is contributed in unequal amounts and the stock distributed without reference to the amounts contributed, upon an agreement that the organizers should be reimbursed for the respective amounts contributed, part of the stockholders having contributed nothing, may maintain an action for reimbursement although he has parted with his stock, his right to recover being dependent upon the agreement and not incident to his being a stockholder.

4. SAME—*when method for reimbursing contributor of capital is not a payment.* The facts that the manner of reimbursing the contributors of the capital of a corporation is fixed by resolution to be by delivering the bonds of the corporation according to the respective amounts contributed, and that such plan is carried out as to all the contributors but one, whose share is set apart, do not operate as a payment to the latter nor prevent his maintaining an action in equity to determine the amount due him and recover the same, where the manner of reimbursement is, as to him, annulled by agreement with the corporation, which agreement also relegates him to his legal remedies to settle the differences.

*Crown Coal and Tow Co. v. Thomas,* 73 Ill. App. 679, affirmed.

APPEAL from the Appellate Court for the Fourth District;—heard in that court on appeal from the Circuit Court of St. Clair county; the Hon. A. S. WILDERMAN, Judge, presiding.

GUSTAVUS A. KOERNER, for appellant.

CHARLES W. THOMAS, for appellee.

Per CURIAM: This is an appeal from a judgment of the Appellate Court affirming a decree of the circuit court of St. Clair county. We have carefully examined the record and the argument of counsel, and are satisfied the Appellate Court reached a correct conclusion. The judgment of the Appellate Court will therefore be affirmed, and as that court in its opinion has fully considered the questions involved, its opinion will be adopted. That opinion, by CREIGHTON, J., is as follows:

"This was a suit in chancery, commenced and prosecuted in the circuit court of St. Clair county by Edward L. Thomas against the Crown Coal and Tow Company, Bart S. Adams and John T. Taylor, and resulted in a decree for $6309.89 in favor of Thomas. The Crown Coal and Tow Company brings the cause to this court by appeal.

"In the year 1887 there was organized under the laws of the State of Illinois a corporation styled 'The Crown Coal Company,' and in the month of March, 1893, appellee, Thomas, and the said Adams and Taylor, owned all of the stock of the said corporation, and the said corporation owned and was operating a coal mine, and had due it a large amount in book accounts for coal sold in course of business, and owed the expenses incurred in operating the mine the previous month. Thomas, Adams and Taylor also owed, jointly, $4500 to one Meisenberger, a former stockholder in said corporation, for his stock jointly purchased by them. Taylor and Adams owned a coal mine known as the 'Harmony Mine,' and certain coal leases. Adams owned an interest in the Western Coal and Tow Company, and one Samuel H. Leathe owned certain coal lands and a line of tugs.

"The above named parties co-operated together, with others, in a re-organization of the Crown Coal Company,

increasing its capital stock from $30,000 to $200,000 and changing its name to the Crown Coal and Tow Company, and all the above mentioned properties were by their respective owners contributed and turned over to the re-organized concern, and its business thereafter carried on with this property. The re-organization was completed at a meeting of all the parties interested, held March 25, 1893, and all the $200,000 of stock was distributed among the contributors and certain other parties who had contributed nothing, without any reference to the amounts contributed by each or to the fact that a number had contributed nothing. At this same meeting, and as a part of the re-organization scheme, it was orally agreed and understood that all who had contributed should be reimbursed by the corporation to the extent of the value of their respective contributions, but the minutes of that meeting contain no mention of such an agreement. The original plan for reimbursement was found to be impracticable, and thereupon, at a stockholders' meeting held March 1, 1894, the following resolution, as shown by the minutes of that meeting, was presented and adopted:

" 'Whereas, the capital stock of this company has been contributed by various stockholders in unequal proportion, the distribution of the stock having been made without reference to the amounts contributed; and whereas, this company was originally projected and organized by the parties interested in a certain railroad then known as the Belleville and St. Louis railroad and now known as the Belleville City railway, as an adjunct to said railroad; and whereas, it was originally contemplated, understood and agreed by the parties interested in the formation and organization of this company, that all the amounts advanced by any of the stockholders to this company should be re-paid out of the proceeds of bonds to be issued by the said railroad company and guaranteed in part by this company, and that the stock of this company should be subject to the indebtedness created by said bonds; and whereas, various of the stockholders of this company, on the faith of the said agreement and understanding, have advanced large sums of money to this company and have conveyed to it property of great value; and whereas, a doubt has arisen as to the legality of such proposed

indorsement or guaranty by this company of the bonds of the said railroad company or the application of the bonds of the said railroad company to the purpose of this company, and said plan has been in consequence abandoned; and whereas, it is the desire of this company that the true intent and meaning of said agreement and understanding be carried out and that the persons conveying their money and property to this company on the faith thereof be protected; therefore it is

" '*Resolved,* That the president of the company deliver to each stockholder who has contributed either money or property to the capital of this company, at par, bonds of this company to an amount equal to such contribution, with interest from the date thereof to this date.'

"There having arisen a dispute as to the amount at which the Crown Coal Company property and good will was taken, that dispute was at that meeting settled, as appears from the minutes: 'The dispute as to the amount at which the Crown Coal Company's property and good will was taken by this company was this day settled by agreement of all the stockholders present, and said figure was fixed at $18,000 of March 1, 1893, the same not to include the book accounts belonging to the Crown Coal Company.'

"In pursuance of the action taken by the stockholders at their meeting of March 1, the directors met March 10, and, as shown by the records of that meeting, unanimously passed the following:

" '*Resolved,* That the Union Trust Company of St. Louis, trustee in the mortgage given by this company to secure its bonds, be authorized and requested to make delivery of said bonds, as follows, to-wit: To Samuel H. Leathe, $118,500; to Bart S. Adams, $10,000; to John Taylor, $4000; to Edward L. Thomas, $5000; all the balance of said bonds to Samuel H. Leathe, treasurer, $62,500.'

"Said trustees thereupon delivered bonds, as directed in said resolution, to all the contributors except the appellee, and stood ready to deliver to him, but those intended for him were, for some reason not explained, so far as we find in this record, attached by Leathe, who was president of the corporation. Pending this attachment

the following agreement was entered into by the Crown Coal and Tow Company, the appellant, and Edward L. Thomas, appellee:

"'Whereas, Edward L. Thomas has certain claims against the Crown Coal and Tow Company, based upon what he claims to be his portion of the purchase price of certain coal pits which were turned over to said company by him and his associates; and whereas, a partial settlement of the said claims has heretofore been made, and certain bonds of said company were set aside to said Edward L. Thomas as in satisfaction or settlement of a portion of said claims, in consideration of the surrender of whatever interest in said bonds the said Edward L. Thomas may have: It is agreed by the said company that any former arrangement or settlement made between the parties, namely, said Thomas and said company, growing out of the said transactions, shall be considered abrogated and annulled and as though it had never been made, and the said Edward L. Thomas shall be relegated to any actions or suits that he may be advised be proper for the purpose of adjusting and settling the differences between him and the said company, growing out of said purchase money or other moneys which he may claim to be due him on account of the transactions hereinbefore mentioned.

"'Dated this eighth day of November, A.D. 1895.

CROWN COAL AND TOW CO.,

By S. H. LEATHE, *President.*

"'We ratify the above, this November 8, 1895.

SAM'L LEATHE, *Director.*

JOHN T. TAYLOR, *Director.*

BART S. ADAMS, *Director.*

FRED B. MERRILLS.'

"Upon the execution of this agreement the bonds set apart to appellee were surrendered to the appellant, and thereafter appellee instituted his suit, which progressed under the original bill to the rendition of an interlocutory decree referring the cause to the master, who took testimony and made report to the court, from which it appears that the balance chargeable to appellant on account of the book accounts belonging to the Crown Coal Company, after deducting the debts of that company, (including the $4500 due Meisenberger from appellee, Adams and Taylor, which appellant had undertaken to

pay out of this fund and had so paid,) amounted to $10,281.56; that the Crown Coal Company's property and good will were taken by appellant at $18,000, and that appellee's portion of the contribution made by himself, Adams and Taylor to the property of appellant at the time of the re-organization was twenty-nine one hundred and twelfths of these amounts, and that appellee owed appellant a small note with accrued interest, amounting to $306.29, showing a balance in favor of appellee of $6309.89.

"Objections and exceptions were filed to the master's report, and a final hearing had upon an amended and supplemental bill, and answer thereto, and a decree rendered in favor of appellee, against appellant, for $6309.89.

"The following errors, in substance, are assigned and urged: The court erred in rendering the interlocutory decree; in not dismissing complainant's bill; in not sustaining exceptions to master's report, finding for complainant, and rendering the final decree.

"It is contended that there was no competent evidence in this record of any agreement to reimburse; that appellee was paid for his interest in the contribution to the property of appellant in stock; that he has been paid to the extent of $5000 in bonds set apart for him in pursuance of the resolution of March 10, 1894; that by the agreement of November 8, 1895, appellant is released from all obligation and duty to pay him; that if any right to recover ever existed it was as a stockholder, and that before the decree in this case was rendered he had sold his stock; and finally, that if appellee has any remedy it is not in chancery, but in an action at law by himself, Adams and Taylor.

"The Crown Coal Company had on hand cash to the amount of between $2000 and $3000, a considerable amount of supplies, a large number of items of book accounts due it for coal, amounting to near $20,000, and owed current expenses and other indebtedness consisting of many

items, and at the time its mine was turned over to appellant by appellee and his associates, Adams and Taylor, its then owners, it was a going concern. The new organization desired to keep this mine in continuous operation, and to that end the moneys, supplies and book accounts of the Crown Coal Company were turned over to it as a part of the contribution of appellee, Adams and Taylor to its property. Appellant absorbed the cash in its business, used up the supplies and undertook the collection of the book accounts and the payment of the debts, opening a separate account with this fund. This account was intricate and involved, and a great portion of the testimony in this voluminous record relates to it, and to contests and investigations concerning items of it. The interest of appellee in both this fund and in the mine and good will was involved with Adams and Taylor, who were also made defendants.

"Where the state of accounts between the parties is complicated and intricate, where the state of accounts between the parties is involved with third parties, where to do justice requires the employment of methods of investigation peculiar to courts of equity, and where it would be very difficult for a jury to unravel the numerous transactions, are conditions usually held to be sufficient to give a court of equity jurisdiction. The jurisdiction in equity does not, in such cases, depend upon the absence of a remedy at law, but upon its adequacy or practicability and upon the discretion of the court. This case is sufficiently involved, complicated and intricate to justify a court of equity in taking jurisdiction of it.

"It is true that the agreement and understanding that the contributors to the property of the re-organized concern should be by it reimbursed for the property contributed by them, respectively, as first made and understood, are not evidenced by any resolution or minute action taken at a stockholders' or directors' meeting, but the oral evidence clearly shows that such agreement was en-

tered into and that such understanding did exist. Leathe, Borman, Chipley, Thomas, Taylor, B. S. Adams and B. F. Adams all testify to it, and it is not controverted. This evidence is competent and material to the proper understanding of the resolutions of March 1 and March 10, 1894. The oral testimony also clearly shows the truth of the recital in the resolution of March 1, that 'the capital stock of this company has been contributed by various stockholders in unequal proportion, * * * without reference to the amounts contributed.' With all these facts before them and clearly understood, the stockholders and directors did, as is properly proven by minutes of proceedings at their respective meetings of March 1 and March 10, 1894, fully ratify and confirm the agreement and understanding shown by the oral evidence. The obligation to reimburse is proven by competent evidence. The whole scheme, as shown by the evidence, manifests the fact that the value of the property of the appellant was to be in its bonds and not in its stock. Appellee was not paid for his interest in the contribution to the property of the company in stock, and reimbursement was actually made in bonds to all the other contributors, which, of itself, is a condition calling, in equity, for like treatment of appellee. True, bonds were set apart for appellee, but before they reached him, by the agreement of November 8, 1895, he surrendered back to appellant all of such bonds, for no other consideration, so far as appears, than that he might prosecute a suit for recovery of the value of his interest in the contribution by himself and his associates to the property of appellant, without prejudice by the act of surrendering his claim to the bonds. Such transaction cannot, in a court of equity, be held to be payment. The 'former arrangement or settlement' which was 'abrogated and annulled' by that agreement is the arrangement to pay a portion of appellee's claim in bonds. The right to demand, and by suit to compel, payment is reserved; and in our opinion appellant

is not, by that agreement, released from all obligation or duty to pay appellee. Although appellee had disposed of his stock in appellant company before the decree in this case was rendered, we are of opinion he is not thereby barred. In our view of the case his right to recover is not dependent upon his being a stockholder. The stock was distributed 'without reference to the amounts contributed,' and large blocks of it given to persons who had contributed nothing. His right to recover is not incident to his stock, but to his having contributed to the property of the appellant under an agreement and understanding that he should be reimbursed, and the ratification and confirmation of that agreement and understanding by appellant.

"There was no error in rendering the interlocutory decree and refusing to dismiss complainant's bill.

"The objections and exceptions to the master's report are not abstracted. Appellant, in his reply brief, says: 'In the abstract it has not been thought necessary to set out the exceptions to the master's report in detail, because the court is not asked to consider the report in detail.' And, 'It is not a question of computation and calculation. Our contention is, the whole thing is wrong.'

"After this case was referred to the master, and while it was pending before him, a suit was instituted in the circuit court of St. Louis county, Missouri, by the St. Louis Dredging Company, against appellant, on an alleged note of the Crown Coal Company, and proof of the pendency of that suit was made before the master. Complaint is made that the master did not, in his statement of account, allow the demand in that suit against appellee, and that the court did not, on account of the pendency of that suit, arrest the further prosecution of this one. It is not contended that should we look into the evidence taken before the master we would find any testimony tending to show that this was a *bona fide* suit, that the Crown Coal Company really owed such a debt, or that

the appellant was liable therefor, in any manner, on account of the Crown Coal Company. We have looked into the record and do not find any such testimony. This was a proper item to bring before the master, and if a valid charge against appellee it should have been proven the same as any other item. It appears the master was of opinion that the mere pendency of the suit was not sufficient proof, and excluded it, and no exceptions to his report appear in the abstract. It does not appear from the record that any application was made to the court to stay the proceedings in this case until the St. Louis case could be litigated. Such an application, at any time before final decree, supported by a proper showing of probable liability on account of that demand, would doubtless have been granted or some order made fully protecting appellant.

"We find no error in sustaining the master's report, in finding for complainant or in rendering the final decree."

*Judgment affirmed.*

Subsequently, upon consideration of the petition for rehearing in this cause, the following additional opinion was filed:

Per CURIAM: In the petition for a rehearing in this case it is said the main item recovered by the decree is $5709.37, to "amount from coal mines." The main error in the findings of the Appellate and Supreme Courts is, that the fact was overlooked that this amount had been paid in the bonds of the Crown Coal and Tow Company.

The appellant agreed to deliver to appellee, Thomas, bonds of the company in payment of $5000 due him for property turned over to the company, but, as we understand the record, he never obtained the bonds. It appears from the record that at a meeting of the stockholders of the appellant company on March 12, 1894, the following proceedings were had: "The dispute as to the amount at which the Crown Coal Company's property and good will was taken by this company, was this day

settled by agreement of all the stockholders present, and said figure was fixed at $18,000, of March 1, 1893, the same not to include the book accounts belonging to the Crown Coal Company." A resolution was passed to issue $200,000 as bonds, and secure them by mortgage to the Union Trust Company, as trustee. The following resolution was also adopted: ·

"Whereas, the capital of this company has been contributed in unequal proportions by various stockholders, the distribution of stock having been made without reference to the stock contributed; and whereas, this company was originally projected and organized by the parties interested in a certain railroad then known as the Belleville and St. Louis railroad, and now known as the Belleville City railway, as an adjunct to said railroad; and whereas, it was originally contemplated, understood and agreed by the parties interested in the formation and organization of this company that all the amounts advanced by any of the stockholders of this company should be re-paid out · of the proceeds of bonds to be issued by the said railroad company and guaranteed in part by this company, and that the stock of this company should be subject to the indebtedness created by said bonds; and whereas, various of the stockholders of this company, on the faith of the said agreement and understanding, have advanced large sums of money to this company and have conveyed to it property of great value; and whereas, a doubt has arisen as to the legality of such proposed endorsement or guarantee by this company of the bonds of the said railroad company or the application of the bonds of the said railroad company to the purposes of this company, and said plan has been in consequence abandoned; and whereas, it is the desire of this company that the true intent and meaning of said agreement and understanding be carried out, and that the persons conveying their money and property to this company on the faith thereof be protected; therefore it is

"*Resolved*, That the president of this company deliver to each stockholder who has contributed either money or property to the capital stock of this company, bonds of this company at par, to an amount equal to said contribution, with interest from the date thereof to this date."

Immediately after the adjournment of the stockholders' meeting a meeting of the directors was held, at which

the president and secretary were directed to cause bonds and mortgage to be issued, as directed by the stockholders.   At a meeting of the directors held March 10 the following resolution was adopted:

"*Resolved*, That the Union Trust Company of St. Louis, trustee in the mortgage given by this company to secure its bonds, be authorized and requested to make deliveries of said bonds as follows, to-wit: To Sam'l H. Leathe, $118,500; to Bart S. Adams, $10,000; to John T. Taylor, $4000; to Edward L. Thomas, $5000; and of the balance of said bond to S. H. Leathe, treasurer, $62,500."

Under these proceedings bonds were delivered to Leathe, Adams and Taylor, but no bonds ever passed into the hands of Thomas.   It is true, Thomas, in his cross-examination, was made to say that he received the bonds, but such was not the case.   He no doubt intended to be understood as saying that the bonds were set apart for him or ordered to be delivered to him.   What counsel for the appellant understands to have been a delivery of the bonds to Thomas is fully explained in his argument on page 20 of his brief, as follows: "Thus we see from his own testimony he did get the bonds,—that is to say, they were delivered to him by the trustee. That they did not reach his hands is not the company's fault.   His testimony above quoted shows that they were arrested in the hands of the trustee by an attachment proceeding by Mr. Leathe,—presumably a creditor of his.   But as far as the company was concerned the delivery was complete.   Its trustee was ordered to deliver them to Mr. Thomas, and did deliver them, or hold them subject to the order of the court in the attachment proceeding."

It thus appears that after the bonds which Thomas was to receive had been made out and were ready for delivery, Mr. Leathe, who was president of the appellant corporation and who held the controlling stock in the company, commenced in the city of St. Louis an attachment proceeding against Thomas and attached the bonds,

177—35

and thus prevented delivery. The fact that a resolution had been passed by the appellant directing a delivery of the bonds did not constitute a delivery, nor did the act of the president of the corporation attaching the bonds before they passed out of the hands of the trustee constitute a delivery. Whether Leathe was to blame for stopping the bonds, or whether Thomas was in fault, does not appear nor is it material. The fact remains that the bonds did not pass from appellant to Thomas. Indeed, it is apparent from a subsequent contract made between the appellant and Thomas that the appellant did not regard the bonds as having been delivered to Thomas. That contract was as follows:

"Whereas, Edward L. Thomas has certain claims against the Crown Coal and Tow Company, based upon what he claims to be his portion of the purchase price of certain coal pits which were turned over to said company by him and his associates; and whereas, a partial settlement of the said claims has heretofore been made and certain bonds of said company were set aside to the said Edward L. Thomas as in satisfaction or settlement of a portion of said claims in consideration of the surrender of whatever interest in said bonds the said Edward L. Thomas may have: It is agreed by the said company that any former arrangement or settlement made between the parties, namely, said Thomas and said company, growing out of the said transactions, shall be considered abrogated and annulled and as though it had never been made, and the said Edward L. Thomas shall be relegated to any actions or suits that he may be advised may be proper for the purpose of adjusting and settling the differences between him and the said company, growing out of said purchase money or other moneys which he may claim to be due him on account of the transactions hereinbefore mentioned.

"Dated this 8th day of November, A. D. 1895.

CROWN COAL AND TOW CO.
By S. H. LEATHE, *President.*

"We ratify the above this November 8th, 1895.

SAM'L LEATHE, *Director.*
JOHN T. TAYLOR, *Director.*
BART S. ADAMS, *Director.*
FRED B. MERRILLS."

In this agreement between appellant and Thomas it is not intimated that Thomas had received the bonds, but it is stated in a mild form that the bonds were set aside for Thomas.   The agreement then provides that in consideration of the surrender of whatever interest Thomas has in the bonds the former arrangement made between the company and Thomas, under which he was to receive bonds in payment for his interest in the property turned over to the company, should be abrogated, and Thomas was left free to institute proceedings to recover of the company for the property he had turned over to it.   The only fair inference that can be drawn from this contract is, that the bonds originally designed for Thomas passed back into the hands of the appellant corporation.

In view of the foregoing, the position assumed in the petition for rehearing, that Thomas was paid in bonds for the property he turned over to appellant, is not borne out by the facts in the record, and the petition for rehearing will be denied.                         *Petition denied.*