In re COUNTRY CLUB BLDG.
CORPORATION.

MURPHY et al. v. BLOOM et al.

BLOOM et al. v. MURPHY et al.
Nos. 6202, 6203.

Circuit Court of Appeals, Seventh Circuit.
June 30, 1937.

Rehearing Denied Sept. 14, 1937.

George I. Haight and Harry A. Biossat, both of Chicago, Ill., for appellants.

Thomas C. McConnell, Irwin T. Gilruth, and Alfred Beck, all of Chicago, Ill., for appellees.

Charles S. Deneen, Roy Massena, and Donald N. Schaffer, all of Chicago, Ill., for Country Club Building Corporation, debtor.

Before EVANS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

MAJOR, Circuit Judge.

The Country Club Building Corporation, debtor, initiated in the District Court a proceeding under section 77B of the amended Bankruptcy Act (11 U.S.C.A. § 207). From a decree which found appellees in No. 6202 as the lawful holders of bonds of the debtor in the principal amount of $582,800 and which denied appellants' claim in No. 6203 in the amount of $37,200, these appeals are prosecuted. Appellants in No. 6202 are appellees in No. 6203 and will be herein referred to as objectors; appellees in No. 6202 are appel-

lants in No. 6203 and will be herein referred to as claimants. The matter, after reference, was heard by a referee in bankruptcy and was before the District Court on exceptions to the referee's report.

Facts as found by the District Court, so far as here material, are as follows: The debtor was incorporated under the laws of Illinois on January 11, 1926, for the purpose of acquiring, owning, erecting, and operating an apartment building at 70th street and South Shore drive in Chicago, Ill. At that time title to the premises was in the names of Edward I. Bloom and Joseph H. Larson, a copartnership doing business under the name and description of Country Club Building Company, which was engaged in erecting and constructing a building on said premises. On January 14, 1926, the land, together with a partially constructed hotel building, was conveyed to the debtor. Up to the time of the conveyance the partnership had expended of its own funds for building, fixtures, furnishings, and miscellaneous items a sum of $528,819.36, all of which funds had been advanced to the partnership by Edward I. Bloom. The capital stock of the corporation was $20,000 divided into shares of $100 each, divided equally between Larson and Bloom except for two shares issued to and held by one Rebecca M. Wren, employed by Bloom as bookkeeper and secretary. The board of directors consisted of Bloom, Larson, and Wren, the first named acting as secretary and the second named, as president. On January 12, 1926, at a meeting of the directors and stockholders of the debtor the following resolution was passed:

"That for the purpose of securing funds for the payment of its obligations, the conduct of its business and the corporate purposes of the corporation, the Directors be and they are authorized and directed to create an issue of the corporate bonds of the corporation to be known as its Six per cent (6%) First Mortgage Gold Bonds, to the aggregate principal amount of One Million Dollars ($1,000,000.00)."

The purpose of this resolution, as found by the District Court, was to authorize a bond issue to raise the necessary funds to complete the building and also to pay Bloom the amount which he had theretofore advanced in the construction of the building. In pursuance of this resolution, the debtor on January 15, 1926, made, executed, and delivered a trust deed to the Stony Island State Bank, as trustee, to secure the bond issue in the principal sum of $1,000,000. On the same day a contract was entered into between the debtor, as seller, and Edward I. Bloom, as purchaser, providing, among other things:

"That the Purchaser agrees to purchase and the Seller agrees to sell and deliver to the Purchaser said bonds for the sum of Nine Hundred Forty Thousand Dollars ($940,000.00), being a discount of Six per cent. (6%), said purchase to be consummated as of February 10, 1926, and accrued interest on said bonds to said date shall be rebated to the Seller at the first interest payment date in said bonds provided, July 19, 1926."

On February 10, 1926, the million dollar issue of bonds was delivered to Bloom, as purchaser, under this contract. The consideration received by the debtor for the bonds issued to Bloom was $940,000, of which amount the sum of $437,562.23 was in cash and a discharge of its obligation to Bloom to the extent of $502,437.77 on account of moneys paid by him prior to January 14, 1926, in and about the erection of the building on the premises acquired by the debtor. Claimants other than Edward I. Bloom acquired their bonds by assignment from him, while objectors who owned bonds in the sum of $3,000 acquired them by purchase at par value. The court further found that the debtor at the time it acquired title to the property, for good and valuable consideration, agreed to assume and did assume the indebtedness of the Country Club Building Company to Bloom. Bloom and his assignees have held the bonds in question for approximately ten years with ownership unchallenged. During this period interest was paid by the debtor without question. No commission was paid Bloom by the debtor for the sale of the bonds, but under the contract of January 15, 1926, heretofore referred to, he was allowed a discount of 6 per cent.

The essential and controlling question involved in No. 6202 is whether or not there was a valid assumption by the debtor of the indebtedness of the copartnership to Bloom as of January 14, 1926. This was recognized by counsel for objectors who, during the hearing before the master, stated:

"When you strip this case from all of its technicalities, all of its argument, we have one question, and that is whether there was a valid, legal, binding agreement made

by this corporation for the assumption of an indebtedness or claimed indebtedness to Bloom."

 If there was such assumption, it naturally follows that claims based upon bonds so issued are valid and binding against the debtor corporation as was found by the court below. While many and varied questions are discussed in appellants' brief, they all, so far as they have any materiality, revolve around this one basic question. The District Court on this issue has made a finding directly contrary to the position sought to be maintained by objectors. It is not the province of this court to ·weigh the evidence or analyze the same except to the extent of ascertaining if the ultimate fact found by the trial court is supported by any evidence. The rule is succinctly stated in McCaughn v. Real Estate Land Title & Trust Co., 297 U.S. 606, on page 608, 56 S.Ct. 604, 605, 80 L.Ed. 879:

"The ultimate question for the decision of the trial court was one of fact and its general verdict was conclusive. The Circuit Court of Appeals was without authority to weigh the evidence and to make its own findings."

Further reiteration of this rule, so often announced, would serve no good purpose. We shall, therefore, only consider the evidence in the light of this rule. As to the finding of the District Court that there was, on behalf of the debtor, an assumption of the partnership debt for a valuable consideration, it is important to further relate the circumstances surrounding the parties at the time of the transfer to debtor by the partnership of the real estate and the issuance of the bonds by the debtor. There is some controversy as to the value of the land at the time of this conveyance. It is claimed by Bloom and Larson that the land had a cost value of $36,150 to which they had each contributed an equal amount, and it is also claimed that they each had contributed the sum of $40,000 in cash, which the debtor received the benefit of. Objectors argue that this cash item is merely a bookkeeping transaction, and that the cost of the land was considerable less than what is claimed. However that may be, the fact remains, and this by stipulation of the parties, that at the time of the conveyance Bloom actually had expended on a partial erection of the building the sum of $528,817.36, and it follows that he had this amount invested in the property over and above any amount

invested by Larson. Notwithstanding this situation, Larson was given the same number of shares of stock in the debtor corporation as was given to Bloom.

 Under these circumstances, the resolution of January 12, 1926, heretofore referred to, was adopted. It is claimed for Bloom that the word "obligations," contained in the resolution, was intended to and did include the money which he had expended in the partial erection of the building, while objectors claim to the contrary. The referee admitted parol evidence to explain what was meant by the word "obligations." We think there was no error in this respect. The purpose of this testimony was not to contradict or change the purport of the resolution, but to explain. In 4 Fletcher on Corporations (1st Ed.) chap. 44, § 2796, page 4055, we find: "Parol evidence is admissible to explain or supplement the minutes of a corporation or to aid in ascertaining the true meaning of indefinite or ambiguous words." Also, see, Crown Coal & Tow Co. v. Thomas, 177 Ill. 534, 52 N.E. 1042; Indian Refining Co. v. Buhrman (C.C.A.) 220 F. 426.

 The parol testimony disclosed that it was intended by the language contained in the resolution under discussion to provide a ·manner for reimbursing Bloom on account of the money invested by him. But, irrespective of this testimony, we think the District Court was justified under the existing circumstances in finding that the word "obligations," as contained in the resolution, was so intended. At that time it was known the amount which Bloom had invested. It was known approximately the amount which would be necessary to complete the building. What could have been the purpose of the debtor in issuing bonds to the extent of a million dollars when it was known that less than half of that amount would be necessary to complete the building unless it was intended, as part of the consideration for the conveyance, that Bloom was to be reimbursed?

Another circumstance which adds strength to this conclusion is that the debtor corporation issued to Larson the same amount of stock as it did to Bloom. Under objectors' theory, this was the total consideration to be received by those making the conveyance. It does not seem reasonable that the parties could have at that time entertained the slightest idea that Bloom, with something over one-half mil-

lion dollars invested in the property more than invested by Larson, should receive exactly the same consideration as he. We are unable to discover any obligations which the debtor corporation had at the time it acquired title to the real estate except that which it assumed by such transfer. This theory also finds support in the fact that three days after the adoption of the resolution in question a contract was entered into with Bloom for the sale of the entire issue, and shortly after that the entire issue of bonds was delivered to Bloom.

Again it seems inconsistent with objectors' theory that if there was no agreement to reimburse Bloom, there should be sold a million dollars worth of bonds when less than one-half this amount was needed to complete the building. The fact that no complaint has been made nor question raised concerning the ownership of the bonds in question for more than ten years, with interest being paid, and that no objection is made to the allowance of the claims except by the objectors herein who only own bonds in the sum of $3,000, is of some significance. There is other evidence in the record which we think tends to sustain the finding of the trial court. We are satisfied the District Court was justified in finding that the debtor assumed the indebtedness of the copartnership to Bloom as a part of the consideration by which it acquired title to the real estate conveyed to it.

The court below disallowed 6 per cent. of the claims as filed, which amounted to $37,200. This is the item involved in case No. 6203, and represents the 6 per cent. discount at which Bloom purchased the bonds as provided for in the contract of January 15, 1926, heretofore set forth. He received no commission or other compensation. Objectors seem to proceed on the theory that in purchasing the bonds he was acting as agent for the corporation, and as a director of the corporation could not charge a commission. This position is not tenable as no question of agency is involved, and the controverted item does not represent a commission for making a sale. It represents a part of the contract entered into between the corporation and Bloom, which contract has been held valid by the master, the District Court, and which finding we approve. To hold the contract valid and to allow the corporation to retain the benefits thereof without, at the same time, according to Bloom, such benefits as the contract provides for him, is inconsistent. Under the contract he purchased the bonds at a discount of 6 per cent. thereby paying $94 for each $100 bond. To now hold he is not entitled to the discount is to hold that he must pay $100 for each bond. To do so would amount to a revision of the contract. We do not understand that a director of a corporation is ipso facto precluded from dealing with the corporation. In fact, if he acts in good faith and for the benefit of the corporation, he may deal with it with practically the same freedom as any third person.

In Omaha Hotel Company v. Wade, 97 U.S. 13, 24 L.Ed. 917, we find a case in many respects similar to the case at bar. There the directors loaned money to the corporation securing their loans by a mortgage on the corporation property which it was claimed was void because of the fiduciary relation sustained by the directors to the corporation. The court on page 22 of 97 U.S., 24 L.Ed. 917, said:

"Examined in the light of the circumstances attending the transaction, as the case should be, the court is of the opinion that the evidence fails to support the proposition that the bonds and mortgage are invalid because the directors became the holders of the bonds and advanced the money. Transactions of the kind have often occurred; and it has never been held that the arrangement was invalid, where it appeared that the stockholders were properly consulted, and sanctioned what was done, either by their votes or silence."

The contract in the instant case was sanctioned and approved by the directors and stockholders. The fact that there are no stockholders, except those who are directors, is not determinative of the issue. As was said in Pain v. Farson, 179 Ill. 185, on page 193, 53 N.E. 579, 582:

"While the directors of an incorporated company represent the stockholders, and their action must be an official action to bind the stockholders, yet where, as here, there are no stockholders except those who are directors, and they assent to a contract of this character, it cannot be held that such contract is a fraud on any one or that the same is invalid."

Of the many cases cited by objectors to sustain their position that of Dixmoor Golf Club v. Evans, 325 Ill. 612, 156 N.E. 785, is typical. The factual situation there is so different from what we find here that it is not controlling. There a suit was brought to compel an accounting of secret profits made by the defendants as organizers of the corporation while they were also

its directors and had management and absolute control of it. The defendants obtained options on property, which it was their duty to buy for the corporation at a price far less than the amount for which they contemplated selling the property to the corporation and made a substantial profit on the transaction without disclosing that fact to the stockholders. The court found such conduct to constitute fraud upon the corporation and required such directors to account for profits so realized. However, the court on page 616 of 325 Ill., 156 N.E. 785, 788, said:

"While a director is not disqualified from dealing with the corporation and buying its property or selling property to it, he must act fairly and be free from all fraud or unfair conduct, his transactions will be subjected to the closest scrutiny, and, if not conducted with the utmost fairness, to the end that the corporation shall have received full value, they will be set aside."

The record establishes to a reasonable certainty that the contract in question was entered into honestly, fairly, and without secrecy. The master during the hearing said:

"His contract to purchase these bonds at ninety-four is a good contract and such bonds as he purchased he had the right to purchase at ninety-four."

Counsel for objectors, with reference to this statement by the master, is quoted as saying: "I would not raise any point on that."

It is also shown that if the bonds had been placed in the hands of a bonding house for sale the commission charged would have been not less than ten per cent. In fact, there is no contention made but what the contract, including the 6 per cent. discount, was fair to the corporation and, we might add, more favorable to it than to Bloom. The latter, under the circumstances presented, is in no different situation than a third person who might have purchased the bond issue under the same contract.

We, therefore, conclude the District Court was in error in deducting 6 per cent. from the amount of claimants' bonds. In this respect the decree of the District Court is reversed and the cause remanded with directions to allow the claims in full.

In all other respects the decree is affirmed.