TELLER v. TONOPAH & G. R. R.

(Circuit Court, E. D. Pennsylvania. ·August 30, 1907.)

No. 17, April Sess. 1906.

1. CORPORATIONS—DIRECTORS—CONTRACT WITH COMPANY.

That directors of a corporation are personally interested in a contract made with the company and are to a certain extent to profit by it does not necessarily condemn the transaction. It merely calls upon them to justify it. ·

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, §§ 1401–1415.]

2. SAME—STOCKHOLDER'S SUIT—INJUNCTION AGAINST CARRYING OUT CONTRACT.

Defendant railroad company entered into a contract with a syndicate, some members of which were its directors, and which had built a connecting line of road, by which defendant was to become guarantor of bonds of a company organized to own such road to the amount of $1,-250,000, and was to receive 51 per cent. of the stock of such company, the syndicate to receive the remainder and the bonds in payment for the road. The control of such line was of great advantage to defendant, and the agreement was approved and ratified by a large majority of the stockholders. There was no proof of any fraud or attempt on the part of the members of the syndicate who were also directors of defendant to use their official position to benefit themselves at the expense of defendant, and they did not in fact control the syndicate. Held, that a single minority stockholder had no standing in equity to enjoin the carrying out of such contract upon allegations that it ought to be more favorable to defendant.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, § 1438.]

In Equity. On final hearing.
See 151 Fed. 607.

W. Y. C. Anderson, for complainant.
John G. Johnson and J. W. Bayard, for defendant.

ARCHBALD, District Judge (specially assigned). This is a bill to prevent the consummation by the defendant company, of which the complainant is a stockholder, of a projected agreement, by which it is proposed to guarantee the bonds of the Goldfield & Bullfrog Railroad to the amount of $1,250,000, in exchange for 51 per cent. of the capital stock of that company, of the face value of $637,500. The charge is that the bargain is an unfair one, having been brought about by the directors of the defendant company with a syndicate of which they are members, formed to promote the construction of the railroad, the imputation being that they have taken advantage of their official position to favor themselves and their associates personally. The defendant company's railroad runs from a point on the Southern Pacific

Railroad, about 100 miles, through Tonopah to Goldfield, both in the state of Nevada, the part to the one place having first been built, and then the part to the other as an independent matter, and the two amalgamated; and the road about which there is this controversy is an extension of 79 miles beyond the end of the existing line to the newly developed mining region, bearing the euphonious name of Bullfrog, which has recently come into prominence. The complainant holds 22⅖ shares of stock (7 preferred and 15⅖ common, together of the par value of $2,240) out of a total of 21,500 shares, and stands alone in his opposition to the agreement, which was ratified by the rest of the stockholders at a meeting of the company, although it is said that one or two others while not joining in the suit are in sympathy with it. But, notwithstanding this disparity, he is entitled to maintain the bill on his own account, if he is right with regard to the subject of it. Neither does it matter that he was offered an interest in the first syndicate proposed, which he declined, and subsequently wanted to get into the present one, after which he began these proceedings; although it cannot be said to inspire confidence in the good faith of them. Nor is it to prejudice him that there was a previous bill by which, upon much the same grounds, he opposed and undertook to prevent the consolidation of the original railroad to Tonopah with the extension to Goldfield, which he now acknowledges was imperative, and has proved immensely profitable; the exchange of stock for bonds which he forced —the one paying 17 per cent. and upwards, and the other 6—discrediting his efforts if not suggesting an undue inclination to litigate.

The position of the complainant is that the Bullfrog extension was so manifestly a paying proposition from the start, and so absolutely necessary to the business of the company, that the directors should either have seen to it that the company built the road itself, instead of lending its credit to others to do so, or if that was not practicable, and it was to be built by a syndicate in which the directors were interested, that the company should get all the stock instead of merely a half of it, the enterprise being financed upon the company's guaranty. The facts are not exactly so, to say nothing of the use made of them. But that is not material. The ability of the company to build on its own account is asserted on the strength of the large returns received from the operation of its road, and the $350,000 of bonds in its treasury expressly reserved for the acquisition of new and additional property out of the issue authorized to take up those of the underlying companies. The credit of the company also, it is claimed, if effective for the benefit of others, was equally available in its own behalf; in which connection it is pointed out that the members of the syndicate have only been called on to pay 25 per cent. of their subscriptions, the rest of the money to build—some $600,000—having been obtained on the syndicate agreement without more. The complainant is even inclined to think that, if for any reason it could not raise the money on its own obligations, the directors who are men of large means should have got it for the company on their personal credit. These are somewhat novel ideas—some of them—but they are not necessarily to be rejected upon that ground. Upon examination, however, they will be found to be altogether untenable, both legally and financially.

It is not necessary to take much time over the suggestion that there was any duty on the part of the directors to raise money for the company personally. There might be exigencies, when they would see fit to do so, but they were not bound to. And as to the financing of the project, in the interest of the company, outside of this, the fact is, as appears from the evidence, that a number of financial institutions were approached in New York, Philadelphia, and elsewhere, in the effort to do so, but without success. No one indeed could be expected to advance money on the mere project to build, particularly in a new and undeveloped mining region of uncertain stability, such as Bullfrog then was. It is possible that the $350,000 of treasury bonds were available and could have been marketed. But the road cost nearly a million dollars, and called for cash, and the balance could hardly have been made up out of income. Nor was a second mortgage to be thought of, the company being already heavily bonded. Besides that, the stockholders were opposed to using the money of the company to build the extension, if they did not actually vote against it. The only thing left was a friendly syndicate, such as was formed, and the case is thus brought down to the fairness of the arrangement proposed to be made with it.

The exact proposition to the company was that the syndicate would build and equip at their own cost and expense the extension from Goldfield to Bullfrog, a distance of 79 miles, according to the location and survey which had been adopted, making it equal in all respects to the road operated by the defendant company; and when so completed, equipped, and paid for, without any liens or incumbrances, excepting a first mortgage for $1,250,000 to secure 6 per cent. 15-year bonds, and capital stock of the same amount, all of which stock and bonds were to be acquired by the syndicate, thereupon, upon the company undertaking to guarantee the bonds, the syndicate agreed to turn over 51 per cent. of the stock, reserving to themselves the benefit of the balance. Or, in other words, without any risk except the contingent liability which it assumed by its guaranty—the road being all built and paid for—for the mere loan of its name the company was to get stock of the face value of $637,500, putting it in control, the guaranty simply enabling the syndicate to float the bonds and get back the money which they had put into the enterprise, with whatever profits there might be above that. Looking at it practically, the fairness of this seems hardly open to question.

The complainant does not object, if a syndicate is the only alternative, to the general arrangement which is so outlined. He recognizes that it would be disastrous if the extension to Bullfrog is not secured and incorporated into the company's railroad system, and that a guaranty of the bonds may be necessary to get this. But he wants all the stock in exchange, and not simply a part of it. He seems to think that not only the directors, but their associates, can be made to take all the risk and forego any of the benefits, and that he and his fellow stockholders, who have advanced nothing, and assumed no responsibility, are entitled to all of them, and this, upon the principle that a trustee can take no advantage to himself out of his position. There is no question of the principle, but it is not ap-

plicable. Upon the same basis, not only the other half of the stock, but all the bonds not needed to reimburse the syndicate for its outlays, would be equally demandable as a part of the profits, which seems to have been overlooked by the complainant or he possibly would have claimed them.

There are several things, however, which stand in the way of adopting his contentions. In the first place it is to be noted that there are 32 members of the syndicate, only 10 of whom, holding considerably less than a controlling interest, are directors in the defendant company. And it can hardly be expected that those who are not will give up what is coming to them out of the enterprise, or that they can be constrained to do so by those who are. The bill is not to compel the directors as trustees to account for and surrender the profits which they will make, assuming that this could have been done upon the present showing. It aims to prevent the carrying out of the arrangement both as to the company and the syndicate, because of the complicity of the directors, who are charged with having used their position to favor it. Its purpose thus is negative, and except as it may possibly force better terms outside of these proceedings, it can effect a negative only. The complainant by these means may hold up the proposition in hope of a better one, but he is not in a position to compel it, nor can the court, if it had the power, be expected to bargain for it in his behalf. The bill is to be sustained, in other words, because the proposed arrangement is tainted or against conscience, and so to be prohibited, and not in order to have the parties come forward with something possibly more favorable.

The alternative, in case the arrangement should not go through, has therefore to be carefully looked to. The members of the syndicate, outside of the directors, who have put their money into the road, and taken the chance of success (which the complainant to the contrary notwithstanding, and by no grace of his, was not so assured in the beginning as it seems now), cannot be expected or required to get nothing out of it. The enterprise was a perfectly legitimate one, as to which they are not in the least beholden to the company, and upon every consideration they are entitled to the full benefit of it. If, then, they cannot secure the terms which they offer, and it must be everything or nothing in dealing with the company as the complainant would have it, they are likely, if indeed they will not be compelled, to go elsewhere with the property. And if, as the result, the road gets into the hands of a rival, as it may, it would be a blow to the company in comparison to which the half of the stock which is haggled for would be trifling. The complainant thinks that self-interest can be relied on to prevent this; enough of the syndicate, outside of the directors, being stockholders in the company. But this is taking large risks. And what right has the complainant to force the issue, or to impose any such extreme and obstructive policy upon the other stockholders? He comes into court as the champion of the company, but as all, except possibly a hesitating contingent, have declared against him, it is simply a question of his own interests. He admits, however, that there will be no direct injury to these, and that his stock will be worth just as much if the arrangement is put through as if it is not. His

only complaint is that it would be worth more with a better bargain, which seems to be his idea of irreparable damage. But, looking to the possibilities, his own bill is the real menace to his holdings, not to say those of others. And while he may be willing to take the chances upon it for himself, he cannot ask that others shall be put at any such hazard.

The complainant's case is thus clearly destitute of equity. It may be that the directors are on both sides of the proposed arrangement, and to a certain extent are to profit by it. But that does not necessarily condemn it. It merely calls upon them to justify it. Jesup v. Railroad (C. C.) 43 Fed. 483. And this they have abundantly done. The proposition made to the company is not an unfair one. The directors have not used their position to unduly favor it. It is to the decided interest of the company that it should be accepted. It would be disastrous, if as a result of these proceedings or for any cause it should be diverted and go elsewhere. The syndicate was made up with considerable difficulty, parties who were approached being reluctant to go into it, for which the pendency of the complainant's previous bill was not a little responsible. It was organized as the only alternative to promote the interests of the company and put through the road for its benefit, giving it control and heading off other roads which were talked of. A better bargain, giving up less stock, could admittedly be made with Senator Clark, who has large interests in the direction of Bullfrog and is seeking a similar entry into it. The guaranty of the company is of course of value, and, enabling the syndicate to float the bonds, as it will, they can afford to pay for it. But the liability assumed is not large, being indirect and contingent and the property good for it, the road having been completed and equipped while these proceedings were pending and being now successfully operated. The price to be paid is substantial, the stock offered to be turned over having a par value of $637,500, which is likely to be, if it has not already been, realized. And it gives control of the property, which is all important. To demand more than this, upon an all or nothing policy, makes the bill little better than an attempted financial hold-up. By every consideration, therefore, being opposed to the best interests of the company instead of conserving them, it must be dismissed, and the arrangement complained of be allowed to be proceeded with.

Let a decree be drawn in favor of the defendants, with costs.