## UNITED STATES v. BYERS et al.
### No. 38.

Circuit Court of Appeals, Second Circuit.
Nov. 13, 1934.

Earl J. Davis and John W. Gilmore, both of Detroit, Mich., for appellant Robert J. Byers.

Curtin & Glynn, of New York City (John J. Glynn, of New York City, of counsel; Charles S. Narins and William J. Reinhart, Jr., both of New York City, on the brief), for appellant George S. Krieger.

Martin Conboy, U. S. Atty., of New York City (William W. Prager and Francis A. Mahony, Asst. U. S. Attys., both of New York City, of counsel), for the United States.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

During the month of February, 1931, the appellant Byers, who had been a legal aid in-

vestigator for the American Legion and since 1925 had been department adjutant and welfare officer for the Department of Michigan, became interested in obtaining surplus army clothing for the needy in Michigan both within and without the Legion. After considerable investigation, during which the possibility and means for obtaining the clothing were fully canvassed, he made arrangements to secure what he wanted and, after other attempts at initial financing had failed, to have sufficient money from two special funds controlled by the state of Michigan used from which to advance the amounts which had to be paid the government for the material. It was then intended to distribute the clothing through the posts of the Legion and through other organizations in the state engaged in relief work and to receive from such bodies the cost of the clothing sent to each so that the advances made from state funds could be returned within sixty days. Byers, before any of the material was received from the government, made a determined and successful effort to have the price reduced 50 per cent. During the formation of the plan, Byers conferred with a Mr. Caplan in Detroit who, it was hoped at first, would supply the money for the purchases and, in May, 1931, Caplan introduced Byers to appellant Krieger as a man with considerable experience in obtaining such surplus material from the government. From then on Krieger actively participated with Byers in forming and carrying out the plan for getting and disposing of this clothing.

For the purpose of this appeal it will be unnecessary to describe in detail all that was done. It is sufficient to know that on December 21, 1931, Byers signed an order for 10,-000 units. This order contained a clause providing that the units would not be sold, and, as the plan to distribute through organizations who would pay the cost was known to the officials of the War Department, it is evident that such a disposition of the clothing was not considered a sale within the meaning of the restriction in the order.

The material was shipped to Michigan, where one-half was placed in a storage warehouse in Detroit and the remainder sent to Lansing. This clothing had been kept many years by the government, and, when Byers tried to secure a loan from a Detroit warehouse with which to pay the purchase price to the government, only 60 per cent. of the value could be obtained. As this was not sufficient, the state of Michigan was then persuaded to advance the money. In the mean-

time Byers sent 10 per cent. of the clothing to New York where Krieger sold it to commercial buyers ostensibly to establish the value of the remainder for the purpose of obtaining a loan to pay the purchase price.

While all this was going on, Byers learned that more of the clothing could be had from the government, and on March 6, 1932, placed a second order, which contained no resale restriction, and which was filled by shipping the clothing to Byers in Michigan. The government was paid in full the purchase price of both orders.

Time went on, and despite some effort to distribute the clothing to the needy, not enough money was obtained in this way to replenish the special funds of the state. None of the goods ordered on March 6th arrived in Detroit before April 7, 1932, and before they were all received the weather had become too warm for such heavy clothing to be much needed. Moreover, the funds of the state had to be replaced in June.

About the 16th of April, but whether in accordance with the original plan of the appellants or not has not yet been decided, Byers began sending more of the clothing to Krieger in New York, who received it and sold it to commercial buyers at prices in excess of the price paid the government. Part of the proceeds of these sales were used to repay the state for its advances. There is evidence to the effect that the appellants divided the remainder between themselves.

Although the appellants urge error on the ground that the evidence was insufficient for submission of the case to the jury, the contrary stands out so clearly that only the refusal of the court to charge that the government must prove that the conspiracy existed before the goods were procured by them need be considered. There was no other serious error. The failure to charge as requested, however, requires that the judgment be reversed and the cause remanded for a new trial.

The appellants were charged in the indictment as follows:

"The said defendants * * * continuously throughout the period of time beginning the first day of June, 1931, and to and including the date of the filing of this indictment, * * * did unlawfully, wilfully and knowingly conspire, combine, confederate and agree with each other * * * to defraud the United States concerning its governmental rights and functions of administering the sale of surplus war merchandise; * * * of and concerning its right to have

those who deal with the government do so honestly; * * * of and concerning its governmental right to determine with a full knowledge of the true facts whether to sell or not to sell certain surplus merchandise; of and concerning its governmental function and right to impose conditions and terms, when and to whom it would make sales of war surplus merchandise."

"It was further a part of said conspiracy that the defendants ⁚ ⁚ ⁚ would obtain surplus army merchandise at reduced prices under a representation that such materials would be used in welfare work by charitable organizations and would be given away and not resold, when in truth and fact the said defendants then and there intended to sell said merchandise, and did sell said merchandise."

The indictment further alleges that a part of the conspiracy was to place an order and request a reduced figure by appearing before the House Military Affairs Committee and by the defendants having Byers designated as welfare officer of the state of Michigan and in that capacity place an order for the merchandise as for charitable purposes and having obtained the merchandise to place it in the name of the department adjutant of the American Legion (Byers), in a United States warehouse.

Counsel for the appellants requested the court to charge the jury that, if they did not find a conspiracy existing prior to the time the appellants obtained the merchandise from the government, they must find the defendants innocent of the conspiracy for which they were indicted. The refusal to so charge is assigned as error.

▮ It is elemental that the appellants can be convicted only for the crime for which they have been indicted.

This indictment contains general and specific allegations charging a violation of section 88, title 18, of the United States Code (18 USCA § 88), reading:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, * * * and one or more of such parties do any act to effect the object of the conspiracy, each * * * shall be fined * * * or imprisoned. * * *"

The general allegations of the indictment effectively charge that the appellants conspired to defraud the United States of its right and function to sell merchandise to the appellants in a described way. They do not deal with a conspiracy on the part of the appellants to sell after they obtain the goods, but a conspiracy to have the government sell to the appellants. Using corelative terms, the general allegations of the indictment charge that the appellants conspired to defraud the United States of its right and function to have people buy from the United States in a way prescribed by regulations. Hence, a reading of the general allegations of the indictment clearly indicated that the appellants are charged with a conspiracy fraudulently to buy or procure merchandise from the United States. No reference whatever is made to fraudulent selling by the appellants —only to fraudulent buying.

So, too, do the specific allegations of the indictment charge a conspiracy to do certain acts to make the United States sell goods to the appellants. There is not a single allegation which does not charge part of a conspiracy to procure goods. It is charged that the appellants conspired to do certain things to procure goods from the United States. Hence the entire indictment discloses that the appellants are charged only with a conspiracy fraudulently to procure merchandise from the United States and not fraudulently to sell goods after procurement.

The lower court did charge:

"It is my charge to you that the fraud as charged here under this indictment may have been consummated through a conspiracy engaged in or entered into either prior to the sale by the government to the State of Michigan or prior to the sale by these defendants of the goods in question. * * * If you find the sale of these goods by the appellants was made as claimed by the government, knowingly and wilfully by these defendants, then you will convict."

This sale, referred to in the last paragraph of the charge quoted, refers to the sale not by the government to the appellants, but by the appellants to others in violation of their contract with the United States that they would not sell. A conspiracy so to sell is not charged in any way in the indictment. To find the defendants guilty of a conspiracy to sell is to find them guilty of something with which they are not charged. The crime charged is a conspiracy fraudulently to procure goods from the government. No doubt the goods were procured from the government, but whether this was done fraudulently or not, as part of a conspiracy, is beside the point in view of this charge.

■ To establish guilt of the conspiracy here charged, two things are necessary: First, a scheme or plan fraudulently to procure goods; and, second, some act in furtherance of, or to effect the object of, this plan or scheme. The scheme or plan must be shown to have existed prior to, or simultaneously with, the act done in furtherance thereof, since 18 USCA § 88 demands that one of the parties to the conspiracy do an act to effect the object of the conspiracy.

The authorities support these views. In Hyde v. Shine, 199 U. S. 62, 25 S. Ct. 760, 50 L. Ed. 90, and Dimond v. Shine, 199 U. S. 88, 25 S. Ct. 766, 50 L. Ed. 99, the court cited United States v. Britton, 108 U. S. 199, 204, 2 S. Ct. 531, 27 L. Ed. 698, saying that the offense of conspiracy consists in the conspiracy, and that the overt act, namely, the act done to effect the object of the conspiracy, affords merely the locus pœnitentiæ, in order that before the act be done either one or all of the parties may abandon their design and thus avoid the penalty prescribed by the statute. 18 USCA § 88.

If the parties to a conspiracy must be in a position to withdraw therefrom before the overt act be committed, it is obvious that the conspiracy from which they can withdraw must be in existence before the act is done.

In Hyde v. United States, 225 U. S. 347, at page 359, 32 S. Ct. 793, 799, 56 L. Ed. 1114, Ann. Cas. 1914A, 614, the court said:

"It must be said that the cases abound with statements that the conspiracy is the 'gist' of the offense or the 'gravamen' of it, and we realize the strength of the argument based upon them. But we think the argument insists too exactly on the ancient law of conspiracy, and does not give effect to the change made in it by Rev. St. § 5440 (18 USCA § 88). It is true that the conspiracy—the unlawful combination—has been said to be the crime, and that at common law it was not necessary to aver or prove an overt act; but section 5440 (18 USCA § 88) has gone beyond such rigid abstraction and prescribes, as necessary to the offense, not only the unlawful conspiracy, but that one or more of the parties must do an 'act to effect' its object. * * * Interpreting the provision, it was decided in Hyde v. Shine, 199 U. S. 62, 78, 25 S. Ct. 760, 50 L. Ed. 90, that an overt act is necessary to complete the offense. And so it was said in United States v. Hirsch, 100 U. S. 33, 25 L. Ed. 539, recognizing that while

the combination of minds in an unlawful purpose was the foundation of the offense, an overt act was necessary to complete it."

These cases clearly establish that there first be formed a conspiracy and then an act done to complete it and carry it out. See, also, United States v. Richards (D. C.) 149 F. 443; United States v. Baker (D. C.) 243 F. 741, 743; United States v. Black (C. C. A.) 160 F. 431, 435; Bell v. United States (C. C. A.) 2 F. (2d) 543, 544.

Here the appellants were indicted for conspiracy to defraud the United States by buying goods under false pretenses. By the charge of the trial judge, the jury was permitted to find them guilty of a conspiracy to sell goods in violation of their contract not to sell. In no way can this latter conspiracy be said to be the former. While, as the appellee argues, the indictment need not be precise in charging the time or place of the conspiracy, yet it is necessary that a defendant be found guilty, if at all, only of the crime charged in the indictment. A conviction for one conspiracy cannot be sustained under an indictment for a separate and distinct conspiracy.

■ Moreover, we think that a conspiracy to sell contrary to an agreement or regulation not to do so, if entered into after title to the goods had passed, would not constitute the crime of conspiracy to defraud the United States. Such a conspiracy must involve a cheating of the government out of property or an obstructing of it in one of its lawful governmental functions "by deceit, craft or trickery, or at least by means that are dishonest." Hammerschmidt v. United States, 265 U. S. 182, 188, 44 S. Ct. 511, 512, 68 L. Ed. 968. And so it was held in this last case cited that to conspire to induce persons to refuse to register under the Selective Draft Act (50 USCA § 226 note) did not fall within section 37 of the Criminal Code (18 USCA § 88). To conspire to break a contract with the United States or to violate its regulations, after title had passed, would seem to involve no such fraud as the purchasing of government supplies with the intention not to abide by a fixed understanding.

Accordingly, the charge criticized was erroneous, not only because a conspiracy entered into after title to the goods had passed was nowhere alleged in the indictment, but also because such a conspiracy if proved was not one to defraud the United States.

Judgment reversed, and cause remanded.