**EPSTEIN v. UNITED STATES.**

**SMITH v. UNITED STATES.**

**EPPS v. UNITED STATES.**

Nos. 10749, 10750, 10751.

United States Court of Appeals
Sixth Circuit.
April 11, 1949.

Wm. Henry Gallagher, of Detroit, Mich. (Wm. Henry Gallagher and Freud, Markus & Gilbert, all of Detroit, Mich., on the brief), for appellants Epstein and Epps.

John W. Babcock, of Detroit, Mich. (John W. Babcock, of Detroit, Mich., on the brief), for appellant Carleton Smith.

Jos. C. Murphy, of Detroit, Mich., and Arden L. Andresen, of Washington, D. C. (Thomas P. Thornton and Joseph C. Murphy, both of Detroit, Mich., on the brief), and Arden L. Andresen and Harvey M. Spear, both of Washington, D. C., for appellee.

Before MARTIN, McALLISTER, and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

Alfred Epstein, Carleton Smith, and Elias Epps were indicted for using the mails in carrying out a scheme to defraud, in violation of the "Mail Fraud Statute," 18 U.S.C.A. § 338 [now § 1341]. The indictment set forth that during the period between June, 1933, and June, 1943, Epstein and Smith were officers and directors of the Pfeiffer Brewing Company, of Detroit, Michigan, and of Drewry's, Ltd., U. S. A., Inc., a brewery in South Bend, Indiana. It was alleged that during the above named period of ten years, Epstein and Smith, together with Epps, organized a succession of companies with the financial support of the Pfeiffer company; that such companies engaged in a course of dealings with the Pfeiffer company and Drewry's through the sale to them of brewing materials and supplies at excessive prices, thereby extracting substantial sums of money from the two breweries, to the benefit of Epstein, Epps and Smith, and to the loss and detriment of the stockholders of the breweries. It was charged that in carrying out this scheme to

defraud, appellants made use of the mails. Upon trial, appellants were convicted by a jury. Epstein was sentenced to serve a term of three years of imprisonment and fined $2,000; Epps was sentenced to a term of three years and fined $4,000; Smith was sentenced to a term of eighteen months and fined $2,000. They appealed, claiming that according to the undisputed proofs, they were guilty of no offense; that there was a fatal variance between the indictments and the proofs; that the district court, through its rulings during the trial, placed upon the appellants the burden of proving their innocence of the criminal charges brought against them by the government, and erred in its rulings on the admission of evidence and in its instructions to the jury.

For the background necessary to an understanding of the case and the issues on appeal, a summary of the facts may be helpful. At the present time, the Pfeiffer Brewing Company is a highly successful business enterprise—in fact, the leading brewery in Michigan in production and sales,—having produced, in the year 1947, a total of 779,000 barrels of beer. Appellant Epstein is now, and has been since its organization sixteen years ago, president and general manager of the Pfeiffer Brewing Company, as well as a director. Appellant Smith, at the inception of the company, was secretary and treasurer, and has been also a director since its origin. The stock of the company is publicly owned and is at present listed on the New York Stock Exchange. Drewry's, Ltd., U. S. A., Inc., is an equally successful brewery, having manufactured and sold 532,000 barrels of beer during the year 1947. Appellant Smith now is, and has been, since its organization thirteen years ago, president and general manager of Drewry's, as well as a director. Appellant Epstein, during the same period, has been a vice president and director of Drewry's.

With the foregoing as some indication of the business capacity of the appellant directors, and the size and successful character of the brewery corporations, it will be helpful to trace the progress and development of the various companies here involved and the activity of appellants, in arriving at the consideration of the legal questions presented by this appeal. Epstein and Epps did not testify in the case and practically all of the facts which follow come from government witnesses, many of them not on speaking terms with appellants, others, nourishing deep-seated jealousies, animosities, and personal grudges against the accused, and some, refusing even to be interviewed by appellants' counsel.

Prior to the prohibition era in the United States, a corporation known as the Pfeiffer Brewing Company had been engaged in business in Detroit, Michigan. During prohibition, its premises and property were acquired by the State Products Company, a corporation that thereafter carried on the business of manufacturing malt. The stock of this company was owned equally by eight individuals, of whom appellant Epstein was one. After the repeal of the Eighteenth Amendment to the Constitution of the United States and the ending of prohibition, the name of the State Products Company was changed back to the Pfeiffer Brewing Company, with the idea of re-entering the brewing business. This plan, however, did not succeed, and in June, 1933, the eight holders of stock resigned as directors and entered an agreement to sell all of their stock holdings to the Dodge company of Chicago, an investment house. About this time, Carleton Smith became associated with the Pfeiffer company as an expert accountant and was elected secretary and treasurer. In the performance of his duties, Smith learned of certain irregularities in the conduct of the financial operations of the Dodge company with respect to the Pfeiffer organization. He immediately reported the situation to the Michigan Securities Commission, which thereupon invalidated further sales of Pfeiffer stock by the Dodge company. Subsequently, the Dodge company defaulted in its purchase payments of the Pfeiffer company, with the result that the premises and property of the Pfeiffer company came back into the hands of the eight stockholders, just where it had been before the sale with the Dodge company had been entered into. However, during the time that the Dodge contract of purchase was in existence, extensive plans had been made for the remodeling of the brewery plant and, as a

758

consequence, the roof and walls of some of the buildings had been torn down pursuant to the plan of rebuilding. When the Dodge company ceased making the payments required for these remodeling operations, the contractors quit the job, leaving the buildings in a half-wrecked, dismantled condition. At this time, the Pfeiffer company was facing bankruptcy.

Shortly after this took place, in November, 1933, the board of directors of the Pfeiffer company importuned Epstein to return to the company and take over its active management. He agreed to do this on condition, however, that the other stockholders would sell him their stock interests, and this they agreed to do.

The Pfeiffer stock, which had been issued at $2.50 a share, was then selling at 50 cents a share. Epstein immediately advanced $50,000 of his own money to the company and induced a friend to invest another $50,000. He further pledged his personal credit for $100,000 with various manufacturers and supply men, and through his brother Epps, procured credit from various manufacturers whose products Epps was then handling. Six months after Epstein took over the management of the dismantled brewery, it produced its first beer; and within a year, the company's stock had risen from 50 cents a share, to $4 a share. Two years later, the Pfeiffer company, under Epstein's management, had a yearly production of 250,000 barrels of beer, which increased each year until, as has been mentioned, it had a production of 779,000 barrels in 1947.

We come, then, to the consideration of the circumstances relating to Drewry's, the other principal brewery corporation in this case.

Appellant Smith, after having rendered considerable assistance in the reorganization of the Pfeiffer Brewing Company, became interested, with Epstein, as a result of the suggestion of a Detroit broker, in another brewery in Davenport, Iowa, and in 1934, was made president of that company. He continued in that capacity and as a director of the Pfeiffer Brewing Company until 1936, when Mr. Schurig, a business friend, directed the attention of Smith and Epstein to the Muesel Brewing Company, in South Bend, Indiana, which at the time was in bankruptcy. Schurig was chairman of the creditors' committee that was endeavoring to work out the financial difficulties of the company under the provisions of the Bankruptcy Act, 11 U.S.C.A. § 1 et seq. Smith and Epstein, after their conferences with Schurig, went to South Bend, made an investigation of the brewery and its business, and thereafter, with several associates, submitted a proposal to the creditors' committee to reorganize the company. In general, the proposal consisted of an offer to authorize and issue new stock and to give creditors whose debts were larger than a certain amount, a percentage of notes and a percentage in cash. Upon examination of the proposal by the United States District Court having charge of the bankruptcy proceedings, the plan was approved by order of the court. In carrying out the approved plan, appellant Smith became president and took over the management of the brewery in South Bend. The parties interested in the reorganization had been able to purchase the valuable right to the use of the name "Drewry's," which was a well-known and famous name of a Canadian brewery; and, accordingly, the name of the reorganized company was changed from the Muesel Brewing Company to Drewry's Ltd., U. S. A., Inc. In effecting the reorganization, Epstein, Smith, and approximately ten other individuals interested in the project raised $240,000 in cash to finance the reorganization. Since that time, Drewry's has increased its annual sales from 60,000 barrels of beer a year in 1936 to 532,000 barrels in 1947.

Appellant Elias Epps is the brother of appellant Epstein. His family name was changed by order of the United States District Court at the time of his naturalization. In June, 1933, he was engaged in business as the Michigan agent of the J. E. Neuman Company, brewery supply dealers, of Pittsburgh, Pennsylvania. It was a period of general financial depression in the nation, and it also marked the beginning days of the brewery business which had been prohibited by law during the preceding 14 years. At that time, Epps could not even guarantee payment of the salary of

a stenographic clerk. He was able to secure a former employee to take charge of the office on the understanding that she would not be able to draw a stipulated salary regularly, until after the business got started. However, by the winter of 1933-34, Epps moved his office to a store and was meeting his expenses regularly. When his brother, appellant Alfred Epstein, assumed the management of the Pfeiffer Brewing Company, Epps was able to secure credit for the company in large amounts because of his business relations with various manufacturers. The credit thereby extended to the Pfeiffer Brewing Company was for brewing equipment and supplies, including malt, hops, filters, filter presses, racking machines, pumps, and barrels. Later, in 1934, Epps concluded his association with the Neuman company, and organized a corporation known as Elias Epps and Company, through which he continued the business of a brewers' supply dealer. He then had as customers fourteen large breweries, not including Pfeiffer or Drewry's. He was also the representative in Michigan of nine other large corporations, including malt, hop, sugar, chemical, cork, tank, and brewery equipment companies. In carrying on the business of Elias Epps and Company, Epps published a 93-page leather-bound catalog which he distributed to all of the breweries in the United States. He also prepared and issued a monthly magazine called *Epps' Bulletin*, devoted to the interests of the brewing industry and containing advertisements of the products which he was handling. In September, 1934, Epps took into business with him L. Navarre Peabody and changed the corporate name to Epps, Peabody and Company. Later, when Peabody withdrew, Epps took Jack Frank, a relative, into the company, and again changed the name of the corporation to Epps, Frank and Company. Thereafter, in September, 1936, this company ceased operations; but the business was taken over by a new corporation organized by Epps, called the Consolidated Brewers' Supply Company, which was, in turn, succeeded by Elias Epps & Company, a partnership. Other corporations organized by Epps which engaged in dealings with the Pfeiffer Brewing Company and

Drewry's were the Chill Foam Corporation, the J. W. Frank Company, and the Taylor-Arvid Company. The government charges that all of these corporations and companies with which Epps was associated were the agencies through which, by virtue of a concealed interest therein, Epstein and Smith defrauded the Pfeiffer Brewing Company and Drewry's by causing such companies to be charged excessive prices on brewery supplies and equipment, to the financial loss and detriment of the breweries; and that Epps, as their agent, took part with the other appellants in the scheme to defraud.

It appears that, according to the established practice in the brewing industry, the price to the breweries of manufactured commodities is the same whether they buy directly from the manufacturers or from a brewery supply dealer. A brewery saves nothing by purchasing directly from a manufacturer; and the fact that the brewery buys through a dealer, while it results in a profit to the dealer, does not cost the brewery any more than if it purchased direct from the manufacturer. With respect to the sale of hops, the situation is somewhat different due to the fact that it is an agricultural item, the price of which is dependent on various factors which cause it to fluctuate from month to month, and from season to season; but even with hops, the established practice is that they are sold to breweries through dealers or agents, invariably with a profit or commission to such dealers or agents, on such sales.

In considering the principal issues in the case, the language of the indictment is of the utmost importance. The scheme and artifice to defraud upon which the charge of using the mails to defraud is based is therein declared to be a scheme in which appellants caused to be organized the numerous companies with which Epps was associated for the purpose of enabling such companies "to purchase brewing materials *for resale to Pfeiffer at increased and excessive prices, to the loss and detriment of the said corporation* and the stockholders thereof." The indictment, in a subsequent paragraph, charges that, as a further part of appellants' scheme to defraud, they had used the Consolidated Brewers Supply

Company as the means and instrument through and by which they would and did extract substantial sums of money from Pfeiffer's and Drewry's, and that "said defendants, to accomplish their fraudulent purpose caused purchases of various brewing materials by Pfeiffer's and Drewry's to be cleared through the said Consolidated Brewers Supply Company *to enable the said company to rebill the said Pfeiffer Brewing Company and Drewry's Limited U. S. A. Inc., at greatly increased and excessive prices on the brewing materials purchased, to the financial loss and detriment of the stockholders thereof.*" In several other paragraphs, the indictment further charged that appellants engaged in the scheme to defraud with respect to other companies— Elias Epps and Company, a partnership, and the Chill Foam Corporation—and caused them to submit invoices at increased and excessive prices to Pfeiffer's and Drewry's, and caused excessive payments to be made by the breweries to the loss and detriment of Pfeiffer's and Drewry's and their stockholders.

In the language of the indictment, there is no uncertainty of meaning. The scheme charged is, plainly, that the appellants entered into a scheme to defraud the Pfeiffer Brewing Company and Drewry's by the grossly fraudulent imposition of selling brewing materials to those companies at excessive prices, which, by virtue of their authority and power as officers and directors in the breweries, Epstein and Smith caused the breweries to pay; and that the three appellants then pocketed such excessive payments themselves. This was a charge of a fraud with a dishonest, immoral purpose—a scheme to charge, not fair prices, but excessive prices, and to cause payment, not of fair amounts for the commodities purchased, but of excessive amounts. There was nothing constructive about this kind of fraud. It was a charge of actual, active, intentional fraud. It was a charge required to be proved against the defendants; and the government started out to prove it.

The trial lasted for nearly four months. In view of the interpretation placed upon the language of the indictment by government counsel in their later arguments, and by the court in its rulings on evidence and charge to the jury—which appellants claim constituted reversible error—it is enlightening to watch the changing color of contention as the case progressed. It was the ultimate claim of the government that the fairness of the prices of the commodities sold by the Epps companies to Pfeiffer's and Drewry's could not be shown by the defense; and that sales of commodities by the Epps companies to Pfeiffer's and Drewry's, even at less than market prices, were sales at excessive and fictitious prices, because they were not sold at the same prices at which the Epps companies had purchased them. That this was not the theory upon which the case was originally based seems demonstrated by a number of circumstances. In his opening statement, government counsel told the jury that they would prove that one of the schemes used by the Epps companies to defraud Pfeiffer's and Drewry's was to go into the market and buy the products needed by the breweries and then resell them to the breweries "at excessive and fictitious prices." As evidence of the government's effort to prove that the Epps companies charged excessive prices to the breweries, that is, prices in excess of the market prices, the district attorney, after the case had been proceeding for a considerable time, in the course of his examination of a witness, stated to the court that he proposed introducing evidence to show that markups were made on sales by the Epps companies to the Pfeiffer Brewing Company. Defense counsel, in making objection to this testimony, inquired whether the government proposed to have the witness then on the stand testify that the invoices on the sales to the Pfeiffer Brewing Company represented markups from other invoices. In reply, the district attorney answered: "No. Markup above and beyond the regular sales price." Defense counsel asked: "Beyond whose regular sales price?" "The regular sale price of the Consolidated Brewers Supply Company and Chill Foam Corporation, and that is certainly part of the fraud in this case," was the answer. And, in resuming his examination, the district attorney asked: "And the markups that you tell us about, do they represent markups in addition to the general price to

the general public"? "That is right." This answer of the witness was later completely disproved; but the examination indicates what the government meant by excessive prices.

The trial court also, during the earlier part of the trial, was of the opinion that the charge against appellants was that which was so clearly stated in the indictment—that the breweries had been obliged to pay excessive prices—more than they would have paid, if they had purchased their brewery supplies from other companies than the Epps corporations. As an illustration of this understanding, it appears that, after the trial had been going on for several weeks, a question arose whether the distribution of the proceeds of profits of the Epps companies could be shown as bearing upon the alleged scheme to defraud. Defense counsel, in stating his objection to the introduction of certain testimony, submitted to the court that the ultimate question on that particular phase of the case was whether any money was fraudulently taken from Pfeiffer by appellants, and if so, how much. In considering the objection, the trial court observed that the question was whether the Pfeiffer Brewing Company had "paid out more than it would have if these several companies had not been created and the profits had not gone into the pockets of the officers who created these companies for the purpose of enriching themselves at the expense of Pfeiffer Brewing Company." Obviously, the court considered at that time that the fraud charged in the indictment and sought to be established by the government's proofs was that the Epps companies sold to Pfeiffer's at higher prices than Pfeiffer's would have had to pay if it had dealt with other supply houses; and that the profits from the Epps companies had gone to the officers who created the companies, at the expense of the Pfeiffer company. There are many other instances, similar to the foregoing, some of which will later be referred to.

As stated, the government started out to prove the fraud charged against appellants —an actual, intentional fraud—and failed. On every occasion on which the government sought to show the charging of excessive prices by the Epps companies and excessive payments by Pfeiffer's and Drewry's, the defense was able to prove by cross-examination of the government witnesses that the sales made by the Epps companies to the breweries were at market prices or below. From a reading of the extensive record, it is notable that practically every government witness did more to prove the case for the defense than the case for the government, probably because the actual facts could not be reconciled with the government's claims. Finally, the government sought to prove that the Epps companies had sold hops to Pfeiffer's and Drewry's at greatly excessive prices. The government witness on this point, on whom the government placed its chief reliance, was Lesh, manager of a hop producers' group in the State of Washington. From the record, he appears to have presented himself as a disinterested farmer engaged in the production of hops while managing, at the same time, the hop producers' association. However, when confronted with questions that might develop evidence favorable to the defendants, Lesh was a stalling, evasive witness who, for a time, was able to conceal his aggressive hostility toward Epps. Defense counsel, on cross-examination, repeatedly forced him to recant many of his damaging statements and hostile testimony by confronting him with letters written above his own signature which Epps had retained for more than ten years from the time they had been written. As an instance of his flagrant hostility, Lesh had been asked by defense counsel, on cross-examination, to produce certain invoices of sales made by his organization. The purpose of the defense in obtaining these invoices was to impeach Lesh, and to show that his hop growers' association had been paying larger commissions to other dealers than he would admit. In the midst of his examination, Lesh asked leave to return to the State of Washington for a few days to transact some necessary business, and upon consent of defense counsel, was permitted by the court to make the trip by plane. On his return, he was asked by defense counsel to produce the invoices which they had requested. He refused on the ground that he had been ordered by the board of directors of the hop growers' association not to pro-

duce them. But on further cross-examination, it was brought out that on his trip to the State of Washington a few days before "on business," Lesh himself had called the meeting of the board of directors, and had asked them to pass the resolution ordering him not to make the invoices available to defense counsel and ordering him not to produce them. In addition to attempting to keep these invoices from defense counsel, Lesh had gotten in touch with the dealer in New York to whom the hop growers' association had for many years paid commissions on the sales of hops and told him not to permit the defense counsel to see any of the records of sales he had made for Lesh's company. The cause for the hostility of Lesh toward Epps was eventually disclosed in the fact that he had previously sold Epps 1,000 bales of hops for future delivery at 37 cents a pound, and when the time for delivery arrived, the market price had greatly advanced. It looked bad for Lesh. The board of directors of the hop growers' association concluded that he had made a poor deal; and refused to carry out the contract until Epps agreed to pay an additional 5 cents a pound in order to get delivery. Later, however, Epps sued the hop growers' association in the United States District Court in Chicago and was able to serve summons upon Lesh at that place, with the result that the association was obliged to settle the case at an expense to itself of $9,000.

Lesh was not of great value as a witness, and the government's attempt to prove by him that Epps had charged excessive prices on sales of hops to the breweries collapsed. However, it appears from the record that during the first part of the cross-examination of Lesh, which was preliminary in nature, a colloquy took place between counsel and the court, in the course of which government counsel stated his objection to certain testimony about sales of hops, whereupon defense counsel declared: *"Well, I thought that all we were concerned here with was whether or not Pfeiffer's and Drewry's were charged more than the market price for hops in the sale by Elias Epps to them."* Government counsel replied: *"That is all you are,* and the instrument you are introducing now certainly doesn't establish anything." Defense counsel then stated: "I expect to establish by this, if the Court please, that this Association and scores of other breweries in this country accepted the Brewers Bulletin as a correct index to what was a fair market price. *And I propose to show that every sale to Pfeiffer's and Drewry's was made under the market price established by that instrument."* The reply of the district attorney was: *"Of course, the proofs are to the opposite."* It thus appears that the issue at that time still was joined on the charge of fraud that Epps had sold the commodities to the breweries at excessive prices —above the market prices.

Thereafter, the defense proceeded to prove, by the cross-examination of Lesh, that Epps had actually purchased hops from Lesh at less than market prices and that he could buy hops cheaper than any other dealer. The defense then undertook to prove, by the cross-examination of Lesh, not only that Epps had purchased the hops under the market price but had sold them to Pfeiffer's and Drewry's below the market price. It was at this point that the prosecution objected to proof of such facts. The ground of the government's objection was that it was immaterial "in such a case that the company (Pfeiffer's) get a commodity or merchandise at a good bargain"; that it made no difference what the market price was when the hops were sold by Epps to the breweries: that it was immaterial whether the prices were fair or not; and that, in any event, they were excessive if the commodities were sold by Epps to the breweries for anything more than the prices he paid for them. This objection was based upon the theory that since Epstein and Smith were interested in the Epps companies, and would secure dividends together with Epps from commissions on sales made to the breweries, any price paid by the brewery for the commodity above the price that Epps had paid to buy the commodity was excessive. In all of its contentions, the government approached the question of the sales of hops and other commodities in many different ways; but it does not now claim that these commodities were not

fully worth everything that Pfeiffer's and Drewry's paid for them.

■ The indictments charge that appellants, as directors of the brewery corporations, caused the breweries to pay excessive prices for the commodities sold by the Epps companies to the loss and detriment of the breweries. To agree with the government's contention and hold that the charge in the indictment is identical to the present accusation that, by virtue of their interest in the Epps companies, appellants were guilty of a breach of trust as directors in dealing with the breweries and receiving profits therefrom, would be to ignore the plain meaning of plain language. A defendant in a criminal case is entitled to know what he is charged with; and he is entitled to be tried on the charges brought against him. Bratton v. United States, 10 Cir., 73 F.2d 795; United States v. Wills, 3 Cir., 36 F.2d 855.

■ In this case, the defense to the charges in the indictment was that the breweries were not charged, and did not pay, excessive prices, but fair prices. The defense to the charge of breach of trust, now relied upon by the government, would have been good faith. The charge in the indictment was entirely different from the accusation of breach of trust through receipt of secret profits by a director. There was, therefore, a fatal variance between the allegations in the indictments and the proofs. Walker, et al. v. United States, 4 Cir., 104 F.2d 465; United States v. Byers, et al., 2 Cir., 73 F.2d 419; Fox v. United States, 7 Cir., 45 F.2d 364; United States v. Wills, supra. On the motion of appellants, the trial court should have entered a judgment of acquittal on the ground of fatal variance; and its refusal to do so was error.

The district court held that the market price of commodities sold by the Epps companies to Pfeiffer's and Drewry's was not material on the issue of whether the Epps companies had charged increased and excessive prices to Pfeiffer's and Drewry's and whether the latter corporations had paid the Epps companies excessive payments to the detriment of the breweries and their stockholders. This holding was based upon the theory that if Epstein and Smith, being directors of Pfeiffer's and Drewry's, had any interest in the Epps companies, they would be guilty of fraud if they secured any dividends or profits from such companies as a result of the dealings between Pfeiffer's and Drewry's and the Epps companies, unless they had disclosed the fact of their interests to the stockholders or a disinterested board of directors of Pfeiffer's and Drewry's. The court, therefore, held that it made no difference whether Pfeiffer's and Drewry's were sold commodities by the Epps companies at market prices or below market prices; whether the prices charged were fair prices; whether the commodities were worth more than the amount paid by the breweries; or whether the breweries got the commodities at an especially good bargain. If Epstein and Smith had any interest in the Epps companies and received any dividends, arising out of the sales of the commodities to the breweries as a result of such interests, the court held, they were guilty of fraud unless the above mentioned disclosures of their interests had been made.

The defense maintained that it was necessary for the government to prove as the principal element of the crime charged that appellants were guilty of active fraud; and that the fact that appellants might have received dividends from the Epps companies as a result of sales of commodities at fair prices or even below market prices, to Pfeiffer's and Drewry's, could not be considered, at most, more than a constructive fraud which had about it nothing inherently unfair, dishonest, or immoral.

The government contended, however, that such fraud was not a constructive fraud but an active fraud; and that if, under the circumstances heretofore mentioned, Epstein and Smith had an interest in the Epps companies from which they received any return, that fact alone was proof of their active and intentional fraud practiced upon Pfeiffer's and Drewry's.

The crucial issue is whether Epstein and Smith were guilty of active fraud, as con-

tended by the government. With regard to Epps, it is claimed by the government that he was merely the agent of Epstein and Smith; that he had knowledge of the fact of their failure to disclose their interests; and that he was guilty of the same active fraud as Epstein and Smith.

■ The court's holding that Epstein and Smith would be guilty of fraud if they were interested in and profited from the companies which sold commodities to the breweries of which they were directors, was based upon the ground that such an interest and profit would be a breach of fiduciary obligation owed to a corporation by a director or officer. There can be no doubt that directors are fiduciaries. "Their powers are powers in trust. * * * Their dealings * * * are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director * * * not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. * * * The essence of the test is whether or not under all of the circumstances the transaction carries the earmarks of an arm's length bargain." Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 245, 84 L.Ed. 281. In Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 599, 41 S.Ct. 209, 212, 65 L.Ed. 425, the court said: "The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation, and where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration."

Transactions between corporations having interlocking directorates, the fairness and good faith of which transactions are challenged, are jealously regarded by the law, and those who would sustain them must show their entire fairness. Tower Hill-Connellsville Coke Co. v. Piedmont Coal Co., 4 Cir., 64 F.2d 817, 823.

■ The foregoing are statements of general rules; but careful analysis is frequently necessary to determine what is the particular duty of a fiduciary under specific circumstances. As was said in Securities Commission v. Chenery Corp., 318 U.S. 80, 85, 63 S.Ct. 454, 458, 87 L.Ed. 626: "We reject a lax view of fiduciary obligations and insist upon their scrupulous observance. * * * But to say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligation does he owe as a fiduciary? In what respect has he failed to discharge these obligations? And what are the consequences of his deviation from duty"? Thus, it is not true, as a general rule, that the directors of a corporation are incompetent to make contracts with themselves as individuals, or that contracts so made may be generally avoided at the suit of the creditors or stockholders of the corporation. In Wyman v. Bowman, 8 Cir., 127 F. 257, the court had occasion to discuss the question of dealings between corporate directors and the corporation of which they were directors, and declared that the only reason why a contract of this character might be set aside in any case is because directors occupy a fiduciary relation to the corporation, and to its creditors and stockholders. The court continued: "This relation is analogous to that of agent to principal, and trustee to cestui que trust, but it is not of so intimate and confidential a character as either of these. Still it is such a relation of trust and confidence that courts scrutinize with jealous care all transactions between directors as officers and as individuals, and require them to be characterized by good faith and the conscientious discharge of official duty. The vice against which they seek to guard them is that the adverse interest of the individuals may overcome the duty of the officials, and induce agreements and transactions detrimental to the corporation, and unduly beneficial to the individuals. Yet in many—probably in most—cases the interest of the directors and officers of the corporation is as great, and it is often greater, in the welfare and success of the

company, than in their individual prosperity. In many cases the prosperity of the individuals is conditioned by the success of the corporation they are managing. There is no sound reason why individuals who are directors of a corporation may not come to its assistance in days of financial distress; may not make their contracts to loan money to it; to receive security from it for repayment; to accept payment of obligations to them, to buy property from, or sell property to, it; or to do any other act beneficial to the corporation, or mutually advantageous to both the corporation and the individuals. * * * *Contracts and transactions between individuals and corporations of which they are directors or officers, which are fair, which are made in good faith, which do not secure to the individuals any undue or unjust benefit or advantage, and in which the interest of the individuals and the duty of the officials work in unison for the welfare of the corporation, are valid and enforceable both at law and in equity.* 127 F. at page 273.

"We do not understand that a director of a corporation is ipso facto precluded from dealing with the corporation. In fact, if he acts in good faith and for the benefit of the corporation, he may deal with it with practically the same freedom as any third person." In re Country Club Bldg. Corporation, 7 Cir., 91 F.2d 713, 716. In Columbus Outdoor Advertising Co. v. Harris, 6 Cir., 127 F.2d 38, 42, in passing upon the fiduciary obligation of a director, this court had occasion to say that "Every such purchase (of property from a corporation) by a president-director is not void as a matter of law and equity as between himself and his corporation, with which he stands in a fiduciary relationship. * * * Such a purchase, however, will be closely scrutinized and the burden is upon the purchaser or those claiming through him to justify it." In Ten Eyck v. Railroad Co., 74 Mich. 226, 233, 41 N.W. 905, 906, 3 L.R.A. 378, 16 Am.St.Rep. 633, the court said: "It is true that contracts entered into between agents of the corporation occupying positions of trust and confidence and a corporation will always be scrutinized with

jealous care by courts, to see that no advantage it taken of the corporation or the rights and interests of its stockholders jeopardized, but it cannot be said that contracts fairly entered into, and honestly executed, where no one is defrauded or overreached, are invalid."

■ It is certainly implied, where not directly held, that from such contracts between a director and his corporation, the director may receive returns or dividends. That is obviously what the many cases referred to on the subject are concerned with. But the receipt of such returns by a director without disclosure of interest to the board of directors does not constitute the perpetration of an active, intentional fraud upon his corporation where there is good faith, fair dealing, and benefit to the corporation of which he is a director.

See McGourkey v. Toledo and Ohio Central Ry. Co., 146 U.S. 536, 13 S.Ct. 170, 36 L.Ed. 1079; Richardson v. Green, 133 U.S. 30, 43, 10 S.Ct. 280, 33 L.Ed. 516; Augusta, Tallahassee & Gulf R. Co. v. Kittel, 5 Cir., 52 F. 63; Teller v. Tonopah & Goldfield R. R., C.C.Pa., 155 F. 482; Barnes v. Spencer & Barnes Co., 162 Mich. 509, 524, 12 N.W. 752, 139 Am.St. Rep. 587; Richardson v. Welch, 47 Mich. 309, 11 N.W. 172.

With the foregoing various statements of the general rule with respect to contracts and transactions between corporate directors and the corporations they represent, it becomes necessary to distinguish between an active fraud perpetrated by a director against his corporation, and a constructive fraud resulting from dealings between a director and his corporation.

■ Courts speak of actual or active fraud as contrasted with constructive fraud. Actual fraud has been defined as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. It requires intent to deceive or defraud. Goodrich v. Waller, 314 Mich. 456, 22 N.W.2d 862; Stern v. National City Co., D.C., 25 F.Supp. 948. To con-

stitute actual fraud, there must be such a fraud as affects the conscience. Lake Hiawatha Park Association v. Agricultural Society, 28 Ohio App. 289, 162 N.E. 653. Constructive fraud is a breach of legal or equitable duty which, in spite of the fact that there is no moral guilt resulting from the breach of duty, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Goodrich v. Waller, supra; Stern v. National City Co., supra. Constructive fraud may be found merely from the relation of the parties to a transaction or from circumstances and surroundings under which it takes place. Lake Hiawatha Park Association v. Agricultural Society, supra. It is said that constructive fraud is a term that means, essentially, nothing more than the receipt and retention of unmerited benefits. Olitkowski v. Loan Association, 302 Mich. 303, 4 N.W.2d 664.

■ In order to prove a scheme to defraud under the mail fraud statute, there must be proof of a scheme embracing active or actual fraud. A charge of using the mails to carry out a scheme to defraud cannot be maintained on proof of mere constructive fraud. In Shushan v. United States, 5 Cir., 117 F.2d 110, 115, which was a case concerned with a fraudulent scheme to bribe public officials to secure excessive fees from the state, the court, in holding that this constituted an active fraud, said: "We agree with appellants that the constructive frauds which equity in civil cases sometimes sets up to do justice will not suffice under this criminal statute; and that there must be a purpose to do wrong which is inconsistent with moral uprightness." The same rule was emphasized and the foregoing statement adopted by the court in the subsequent case of Bradford v. United States, 5 Cir., 129 F.2d 274.

■ Conceding this to be the rule of law, nevertheless, the government attempts to neutralize its effect by emphasizing that the "elements of fraud developed in civil cases are applicable in prosecutions under the mail fraud laws." United States v. Buckner, 2 Cir., 108 F.2d 921, 926. And

use of the mails to defraud is not limited to what would give rise to a common-law action for deceit. United States v. Groves, 2 Cir., 122 F.2d 87. Assuredly, we must consider fraud in mail fraud cases according to the standard of what fraud is in civil cases. That, however, is no qualification of the rule that to sustain a charge of using the mails to defraud, there must be proof of an actual fraud, rather than a constructive fraud; and the fact that the crime of using the mails to defraud is not limited to what would give rise to a common-law action for deceit means, for instance, that a showing of loss to the victim is not necessary to conviction for mail fraud; it does not imply that constructive fraud, or anything less than actual fraud, can sustain the charge of using the mails to defraud.

■ Counsel for the government contend, however, that appellants were guilty of actual fraud. They cite United States v. Buckner, supra, as holding that conduct may be not only a breach of trust, but, at the same time, an active fraud. Whether a breach of trust is an active fraud depends upon what the particular breach of trust consists of. It may be an active fraud or a constructive fraud, or even a crime, as in the case of a trustee who loots a trust fund. But because a breach of trust may be an active fraud or a constructive fraud does not make the terms, active fraud, and constructive fraud, interchangeable. It does not imply that there is no difference between them. In this case, the crux is whether appellants' conduct amounted to an active fraud. If what they did resulted in constructive fraud, or no fraud, the government failed to prove any case against them.

■ In its claim that appellants were guilty of actual fraud, the government relies principally upon four cases as determining that conduct similar to that of appellants was sufficient to sustain a charge of using the mails to defraud. An examination of these cases discloses that none is in any way similar to the instant case. In Shushan v. United States, 5 Cir., 117 F.2d 110, parties engaged in a scheme to defraud a state commission through

obtaining money by false pretenses whereby a state employee was to be bribed to bring about the allowance of exorbitant and excessive fees. In United States **v.** Groves, 2 Cir., 122 F.2d 87, a corporate officer caused his corporation to buy in a large amount of its own stock from a third party at an inflated price, greatly in excess of its real or market value, pursuant to a prearranged understanding between the director and the third party that they would divide the profits received from the inflated sale to the corporation; and in carrying out the plan, the director used inside information, received by virtue of his office, to his own benefit and to the detriment of the corporation. His profit at the expense of the corporation was clearly proved. In United States v. Buckner, 2 Cir., 108 F.2d 921, two individuals, who were elected chairman and vice chairman respectively of a bondholders' committee, formed to promote the interests of the bondholders, conspired with others to use inside information, which they obtained as members of such committee, against the interests of the bondholders and for their own profit. In Landay v. United States, 6 Cir., 108 F.2d 698, there was a conspiracy to cause the issuance of the stock of the corporation to third parties, ostensibly as compensation for purchases of property by the corporation and for services rendered to the corporation. The stock, which was fraudulently issued without any consideration whatever, was thereafter returned by the third parties to the conspirators, who resold it to the general public and pocketed the proceeds. In all of the foregoing cases, the conduct of the accused parties was permeated by fraud. There was no attempt made, nor could any be made, to show fairness in the dealings with the corporation, for every aspect in the transactions there involved was the antithesis of fairness and honesty. In none of these cases could a disclosure of interest on the part of the directors or conspirators make the transactions anything but actively fraudulent and dishonest. They depended for their success upon concealment and deception and could not conceivably be carried out by the guilty parties without covering up the true facts. In such dealings between the fraudulent directors and conspirators and the corporations, there was no advantage, but only detriment, to the corporations represented by the recreant directors, trustees, or conspirators. The government refers to various expressions from the opinions in the cases which it has cited as applicable and determinative of the present controversy. General expressions in opinions are to be taken in connection with the case in which those expressions are used. Wright v. United States, 302 U.S. 583, 58 S.Ct. 395, 82 L.Ed. 439. An opinion, and expressions in an opinion, are qualified by the particular facts of the case in which they are used. W-R Co. v. Sova, 6 Cir., 106 F.2d 478. All of the cases relied upon by the government are concerned with active fraud.

To sustain the government's contention would require a holding that every director of a corporation was guilty of perpetrating an active, intentional fraud upon his corporation if he received any returns from his stockholdings, however small, in another company that did business with the corporation of which he was a director, unless his interests were disclosed to, and approved by the board of directors, regardless of good faith, fairness of dealings, and profit and advantage to the company of which he was director. This is not the law.

With respect to fraud, "*The particular facts determine its presence or absence on principles long settled by the courts in civil and criminal cases alike.*" Foshay v. United States, 8 Cir., 68 F.2d 205, 211. The validity of transactions between a director and his corporation depends upon their nature and the surrounding circumstances. Hubbard v. New York, N. E. & W. Investment Co., C. C. Mass., 14 F. 675.

If the transactions between the Epps companies and the brewery corporations were advantageous to the corporations; if the corporations received full value in all the commodities purchased, if they

were able to buy from the Epps companies at market prices or below; if, as a result of the transactions and purchases from the Epps companies, there was no detriment to the corporations; if the corporations secured better bargains in dealing with the Epps companies than they would in dealing with other brewery supply companies; if the transactions were fair and above criticism in every way, except for the fact that Epstein and Smith did not disclose to the breweries that they had an interest in the Epps companies: it must then be concluded that the failure to make such disclosure did not clothe this otherwise fair course of dealing with intentional fraud, dishonest in purpose, and inconsistent with moral uprightness. 'Certainly, a mere disclosure of interest could not convert an actual fraud with a wrongful purpose to injure or deceive, into an honest, moral transaction with a purpose to benefit. It is this consideration that serves as a criterion for distinguishing cases cited by the government to sustain its contention that lack of disclosure of interest—or secret profits, as the government terms it—proves actual fraud in this case.

■ In the present case, it seems to be agreed that the transactions would not be subject to the charge of fraud, if the directors had disclosed their interest. There was, therefore, nothing inherently dishonest or inconsistent with moral uprightness about these transactions. For an inherently dishonest transaction could not become inherently honest by merely telling the other directors about it. There was no actual fraud on the part of appellants in failing to disclose their interests in the Epps companies. At most, under the circumstances of this case, such failure to disclose could amount only to a constructive fraud; and that is not sufficient to sustain a charge of using the mails to defraud.

■ In this case, it may well be doubted whether, under the law of Michigan (where these transactions took place), the nondisclosure by appellants of interest in the Epps companies and their receipt of

dividends therefrom could be termed even a constructive fraud. The Michigan statute provides: "No contract of any corporation made with any director of such corporation or with a partnership or other group or association of which any such director shall be a member or with any other corporation of which such director may be a member or director and no contract between corporations having common directors shall be invalid because of such respective facts alone. When the validity of any such contract is questioned, the burden of proving the fairness to the contracting parties of any such contract shall be upon such director, partnership, other group or association, or corporation who shall be asserting the validity of such contract." Act 327, P.A. 1931, Sec. 13, subd. 5, M.S.A. § 21.13, subd. 5.

Since a contract between a corporation and a director of such a corporation, or with a group of which he may be a member, is not invalid because of that fact, such a contract cannot be said to be fraudulent because of that fact. Of course, if there is an active fraud on the part of a director in contracting or dealing with his corporation, the fraud would vitiate the contract. But aside from the intervention of active fraud, a contract is not invalid merely because it is between a corporation and a director owing it a fiduciary duty. Since the statute declares that such a contract is not invalid, but only requires proof of fairness by the one asserting its validity, *when its validity is questioned,* such a contract is not, even in civil cases, presumptively invalid or constructively fraudulent. No question of its validity arises until its fairness is challenged. To give effect to the government's claim requires a holding that a transaction which, in a civil case, would be, at most, constructively fraudulent—and, in Michigan, not even constructively or presumptively fraudulent—would, in a criminal case, constitute proof of active, intentional fraud, which could not be rebutted by evidence of fairness or good faith. We are constrained to hold that the ruling of the trial court sustaining the government's contention was error. The government's proofs with regard to

the transactions between the Epps companies and the breweries did not support the charge that appellants had carried on a scheme to defraud by the use of the mails.

■ With regard to the facts in the case, we have made a minute examination of the entire record and have subjected all of the transactions charged as frauds by the government to particular scrutiny. In none of the transactions upon which the government founded the indictments is there proof that any appellant was guilty of active fraud or breach of trust toward Pfeiffer's or Drewry's. As far as the evidence discloses, all of the sales of commodities by the Epps companies were fair and beneficial to the breweries—in most cases being at less than market price. There was no proof of charging excessive or fictitious prices to the breweries, as alleged in the indictments. Certain of the transactions between the breweries and the Epps companies masqueraded under false bookkeeping entries and concealed illegal transactions, such as loans to taverns and political contributions, which misled the government into assuming that these were fraudulent withdrawals of funds for the benefit of the appellants; but government witnesses finally elucidated these matters which were in no sense frauds upon the breweries.

■ Moreover, there is no evidence that Epstein ever had any interest in the Epps companies. What the government contends is circumstantial evidence of such an interest is so tenuous and impalpable and remote from the facts sought to be proved that it cannot be said to be sufficient to support the criminal charge. For it is the rule "where guilt depends entirely upon circumstantial evidence, that the burden rests upon the government to prove its case not only beyond a reasonable doubt but to the exclusion of every reasonable hypothesis of innocence." Beckman v. United States, 5 Cir., 96 F.2d 15; American Tobacco Co., et al. v. United States, 6 Cir., 147 F.2d 93.

Proof of Epps' guilt of taking part in a scheme to defraud by the use of the mails is equally lacking. After representing a

supply house, he formed his own company. When his brother, Epstein, organized the new brewing corporation and needed credit to operate, Epps was able, through his relations with the various manufacturers, to secure credit for Pfeiffer's for the malt, hops, pumps, barrels, machinery, and equipment to start the business. In operating his own company as a brewery supply house, Epps leased a two-story building, a block long, with railroad frontage. Later, among other companies, he organized the Chill Foam Company to manufacture a compound used in the manufacture of beer to prevent its becoming cloudy when chilled. He acquired a secret formula, retained an outstanding firm of chemical analysts, and changed the ingredients of the compound from time to time until it was sought by many breweries for its high qualities. In the purchase of hops, Epps studied the field carefully and employed able assistants. His acumen in purchasing was reflected in the fact that he was able to buy hops from the Washington growers' association at a lower price than any other dealer and that his judgment in purchases for future delivery was superior to that of the president and manager of the hop growers' association, who was supposed to be an expert. As far as the evidence discloses, the Epps companies received the same commissions or profits on the sales of commodities from Pfeiffer's and Drewry's that Epps had received from the other breweries to whom he had previously sold. The government emphasizes the fact that the profits from the Epps companies were out of proportion to the invested capital. But the Epps companies were selling organizations and their profits did not depend upon invested capital. When Drewry's was organized, Epps procured credit for that company from numerous supply houses and extended credit himself during at least its first eight years of operation, during which the monthly balances due him from Drewry's, commencing at $20,000 in 1936, increased to as much as $55,000. The evidence does not support the contention of the government that Epps was merely a dummy or servant of Epstein and Smith

and that his various companies were in reality only the Pfeiffer Brewing Company, operating under the guise of his name. According to the government's theory, in order to convict Epps of scheming with Smith and Epstein to defraud Pfeiffer's and Drewry's, it was necessary to prove not only that Epstein and Smith had interests in the Epps companies which they did not disclose to the other directors or stockholders of the two brewing companies, but that Epps knew that they did not disclose such interests; and of this, there is no proof whatever.

The verdict of the jury, finding Smith guilty of using the mails to defraud, was limited to transactions between Drewry's and Elias Epps and Company in which the government contended Smith had an interest. On this point, the proofs seem somewhat speculative. In any event, there was introduced in evidence the articles of incorporation of Drewry's, which provide: "If this corporation enters into contracts or transacts business with one or more of its directors, or with any firm of which one or more of its directors are members, or with any other corporation or association of which one or more of its directors are shareholders, directors, or officers, such contract or transaction shall not be invalidated or in any way affected by the fact that such director or directors have or may have interests therein which are or might be adverse to the interest of this corporation, provided that such contract or transaction is entered into in good faith and in the usual course of business."

Assuming that Smith had an interest in Elias Epps and Company, there was no proof that any transaction between that company and Drewry's was not entered into in good faith and in the usual course of business.

Other claims of error are advanced by appellants, and, while they have been duly considered by the court, their determination is not necessary to decision.

Upon review of the record and in accordance with the foregoing conclusions, the judgments of conviction are reversed; the sentences are set aside; and the appellants are discharged.